**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (CES-2130)

Attorneys for Appellants, Urban Communicators PCS
  Limited Partnership, et al., Debtors-in-Possession

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| URBAN COMMUNICATORS PCS LIMITED | : | 08 Civ. 502 |
| PARTNERSHIP, *et al.*, Debtors, | : | 08 Civ. 945 |
| | : | 08 Civ. 946 |
| Appellants. | : | 08 Civ. 947 (RWS) |
| | : | |
| -against- | : | USBC 98-B-47996 |
| | : | 98-B-47997 and |
| GABRIEL CAPITAL, L.P., | : | 98-B-10086 (REG) |
| | : | |
| Appellee. | : | <u>Jointly Administered</u> |
| | : | |

-------------------------------------------------------------x

---

## APPELLANTS' BRIEF

---

**WINDELS MARX LANE & MITTENDORF, LLP**
Charles E. Simpson (CES-2130)
156 West 56th Street
New York, New York 10019
(212) 237-1000

Attorneys for Appellants, Urban Communicators PCS Limited
Partnership, *et al.*, Debtors-in-Possession

{10439957:1}

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Churchill Mortage Inv. Corp.*, 233 B.R. 61 ............................................................20

*In re Denofa*, 124 Fed. Affx. 729.....................................................................................18

*In re Eliot*, 64 Bankr. 429 ..........................................................................................22, 23

*Emanco*, 45 Bankr. 627.......................................................................................................23

*FCC v. Nextwave Personal Communications, Inc.*, 123 S.Ct. 832.....................................12

*Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 .............................................2, 4, 25, 26

*In re Gabor*, 155 B.R. 391 ..................................................................................................23

*In re Joubert*, 411 R. 3rd 452 .............................................................................................28

*In the Matter of Amendment of the Commission's Rules Regarding Installment
    Payment Financing for Personal Communications Services (PCS) Licenses,
    Second Order on Reconsideration of the Second Report and Order, F.C.C.
    99-66, 14 F.C.C.R. 6571* ...............................................................................................9

*In re Kirk Merkely*, 94 FCC 2nd 829 ............................................................................19, 20

*In re MLQInvestors, LP v. Pacific Quadracasting*, 146 F. 3rd 746...................................21

*In re MagnaCom Wireless*, 2007 U.S. App. LEXIS 22151 .......................................4, 9, 21

*In re Nextwave Personal Communications, Inc.*, 235 B.R. 305 .........................................10

*Nextwave Personal Communications Inc. v. FCC*, 254 F. 130....................................11, 12

*In re Ridgely Communicaitons, Inc.*, 139 B.R. 374 .....................................................19, 20

*In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790 .............................................................3

*United Savings Assn. v. Timbers of Inwood*,  484 U.S. 365................................................24

*Takisaki v. Alpine Group Inc.* (In re Alpine Group, Inc.), 151 B.R. 931............................2

*In Taylor*, 263 B.R. 139 ......................................................................................................28

## DOCKETED CASES

*In re Cheskey*, 9 FCC Res 986 ........................................................................20

*In re GWI PCS, Inc.*, Adv. Pro. No. 397-3492 .................................................10

*Radio KDAN, Inc.*, 11 FCC 2nd 934 ................................................................19

*Urban Comm-North Carolina, Inc. v. FCC*, No. 01-1490,................................12

## FEDERAL STATUTES

11 U.S.C. §§362(d) and 363(e) ........................................................................13

11 U.S.C. § 506 ...................................................................................1, 4, 18

47 C.F.R. §1.2110(g)(4).............................................................5, 10, 11, 13, 22

47 C.F.R. §24.711(b) .................................................................................8, 11

47 U.S.C. §301 .......................................................................................21, 22

Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, §6002(a), 107
    Stat. 312, 387 ...........................................................................................5

# **TABLE OF CONTENTS**

I PRELIMINARY STATEMENT ...................................................................................2

II    QUESTION PRESENTED ....................................................................................4
III   BACKGROUND AND UNDISPUTED FACTS ....................................................5
    A.    Gabriel Capital, L.P. ................................................................................5
    B.    The FCC's Lien on the Licenses...............................................................8

IV CHAPTER 11 FILING .............................................................................................8
    A.    Adversary Proceeding Against the FCC ..................................................10
    B.    The FCC's Re-Auction of the Licenses ...................................................11
    C.    The D.C. Circuit's Nextwave Decision ...................................................11
    D.    The Supreme Court's Decision in Nextwave...........................................12

V THE SECURED CLAIMS.........................................................................................12
    A.    The FCC...................................................................................................12
    B.    Gabriel....................................................................................................14

VI THE SALE OF THE LICENSES ............................................................................14
    A.    SunCom Wireless, Inc. ............................................................................14
    B.    Cellco Partnership d/b/a Verizon Wireless .............................................15

ARGUMENT ...............................................................................................................17
    THE RELEVANT DEBTOR AND ASSETS ................................................18
    GABRIEL HAS A SECURITY INTEREST SOLELY IN THE
        PROCEEDS OF SALE OF THE LICENSES ...................................19
    §506(b) PROHIBITS THE PAYMENT OF ...............................................22
    THE FCC'S CANCELLATION OF THE LICENSES................................27

CONCLUSION.............................................................................................................29

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (CES-2130)

Attorneys for Appellants, Urban Communicators PCS
 Limited Partnership, et al., Debtors-in-Possession

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
URBAN COMMUNICATORS PCS LIMITED :  08 Civ. 502
PARTNERSHIP, *et al.*, Debtors,    :  08 Civ. 945
              :  08 Civ. 946
        Appellants. :  08 Civ. 947 (RWS)
              :
  -against-       :  USBC  98-B-47996
              :    98-B-47997 and
GABRIEL CAPITAL, L.P.,    :    98-B-10086 (REG)
              :
        Appellee. :  <u>Jointly Administered</u>
              :
-------------------------------------------------------------x

   Appellant,  Urban Communicators PCS Limited Partnership ("UC-LP"), and Urban

Comm-Mid-Atlantic, Inc. ("UC-MA") and Urban Comm-North Carolina, Inc. ("UC-NC"),

Debtors-in-Possession (jointly referred to hereinafter, as the "Appellants" or "Debtors"), by their

undersigned counsel, as and for their Appellants' Brief and in furtherance of Appellants' appeal

from the "Decision and Order on Gabriel Entitlement to Post-Petition Interest" of Honorable

Robert E. Gerber, United States Bankruptcy Judge, So-Ordered December 11, 2007, granting

Gabriel Capital, L.P.'s ("Gabriel") motion for an award of pendency interest to the extent

Gabriel's simple interest equivalent rate does not exceed 25%, respectfully represent as follows:

# I.

## PRELIMINARY STATEMENT

On April 7, 2005, the Bankruptcy Court (Hon. Robert E. Gerber, U.S. Bankruptcy Judge) heard oral argument from the Debtors and Gabriel on the issues of whether, after sale of UC-NC's PCS Licenses (the "Licenses") for an amount in excess of the amount of Gabriel's claims, whether Gabriel's claims were oversecured for purposes of 11 U.S.C. § 506(b), thus entitling Gabriel to postpetition or pendency interest. At the conclusion of the April 7, 2005 hearing, the Bankruptcy Court made the following preliminary determinations:

     A.      With respect to the sales proceeds from the Verizon and Triton sales transactions, Gabriel is to be treated by the Debtors as fully secured;

     B.      For purposes of §506(b) of the Bankruptcy Code, value of collateral is measured at the time of the sales transaction, relying on the decisions in the *Alpine*[1] and *Ford Motor Credit*[2] cases;

     C.      The Bankruptcy Court would accept further submissions on the appropriate interest rate applicable to Gabriel's secured claims;

     D.      The Bankruptcy Court found that the question of Gabriel's secured status was straight forward and that it was unlikely that there would be a change in the Bankruptcy Court's thinking in its final decision;

     E.      That *Ford Motor Credit* and *Alpine* provide the proper approach to valuation when collateral is sold and that it was better to use the actual value realized at a sale versus the value of collateral at the beginning of a chapter 11 case, especially where, as here, the assets value is volatile;

---

[1] *Takisaki v. Alpine Group Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931 (Bankr. 9th Cir. B.A.P. 1993).

[2] *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994).

F.      Found that *T-H New Orleans*[3] supported the "let the market value" approach and that an increase in the value of collateral should go to secured creditors;

G.      There would be a single written opinion and the time to appeal the Bankruptcy Court's decision would commence from entry of the Bankruptcy Court's Final Order after receipt of the Bankruptcy Court's written opinion; and,

H.      The Bankruptcy Court's determination was "also materially affected" by another factor, which is that the bundle of available assets that comprised Gabriel's collateral, which would be relevant irrespective of the time that you measured the value of collateral, included its litigation rights against the FCC as manifested both by those litigation rights themselves and as they affected the value of the securities, the equity securities which were pledged in favor of Gabriel and which Urban Comm, the three Urban Comm entities or those which had rights against the FCC, continued to retain. The Bankruptcy Court held that with the Supreme Court's decision in the *Nextwave* case, it is plain that the litigation rights always had value, and even if one did not subscribe to *Ford Motor Company* or *Alpine*, one could not ignore the value of those litigation rights or the value of the common stock of the three entities whose stock was pledged."

On December 11, 2007, as corrected by "ErrataOrder re: Decision and Order on Gabriel Entitlement to Post-Petition Interest", dated January 31, 2008, the Bankruptcy Court entered its written opinion (i) granting Gabriel's motion for pendency interest, (ii) allowing such interest to the extent that Gabriel's simple interest equivalent rate not exceed 25% per annum and (iii) rejecting Appellants' contentions that Gabriel is entitled to less or nothing and (iv) Gabriel's contention that it is entitled to more.

---

[3] *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790 (5th Cir. 1997).

Notwithstanding the Bankruptcy Court's preliminary and written decisions, the Debtors maintain that the Bankruptcy Court erred in its decision and reiterate their position that Gabriel was an undersecured creditor, secured in name only both prior to and following UC-NC's October 28, 1998 petition date.  The Debtors further maintain that the Bankruptcy Court's reliance on the Alpine and *Ford Motor Credit* cases is misplaced, and that reliance is better placed on the decision of the U.S. Court of Appeals for the Ninth Circuit in *Thacker v. FCC (In re MagnaCom Wireless)*.[4]  Under the facts of these Chapter 11 cases and in accordance with (a) the Rules and Regulations of the FCC, (b) the Communications Act of 1934 and (c) a strict reading of §506(a) and (b) of the Bankruptcy Code, Gabriel was not oversecured on the Petition Date, and continued to be undersecured up and until, at the earliest, completion of the sales transactions. Therefore, Gabriel falls within the general rule embodied in §506(b) and the cases interpreting §506(b) disallowing post-petition interest on the claims of undersecured creditors.

## II.

## <u>QUESTION PRESENTED</u>

Did the Bankruptcy Court commit error in its holding that Gabriel was a secured creditor?

---

[4] 2007 U.S. App. Lexis 22151 (9th Cir. Sept. 17, 2007).

## III.

## BACKGROUND AND UNDISPUTED FACTS

In 1993, Congress passed §309(j) of the Federal Communications Act, which authorized the Federal Communications Commission (the "FCC") to replace its existing system for licensing spectrum with an auction process. With respect to PCS spectrum, the FCC divided this spectrum into six (6) blocks, A through F, with "C-Block" licenses designated for small business participation. In addition, successful bidders were permitted to finance their license acquisitions on an installment basis.[5]

In May 1996, UC-LP was the successful bidder for the right to apply to the FCC for licenses to operate ten (10) "C Block" PCS licenses. UC-LP, with the FCC's consent and approval, assigned its rights as the successful bidder to UC-NC, a wholly-owned indirect subsidiary of UC-LP. UC-NC's corporate purpose was to finance the acquisition of and to build and operate a digital PCS systems in the geographical areas where UC-NC was granted PCS licenses.

### A.    Gabriel Capital, L.P.

Under the auction terms, UC-NC was required to post a purchase deposit with the FCC equal to ten (10%) percent of the successful bid for the Licenses.[6] UC-NC financed the purchase deposit, borrowing $8,000,000.00 from Gabriel evidenced by, among other documents, a Note

---

[5] See, Omnibus Budget Reconciliation Act of 1993. Pub.L. No. 103-66, §6002(a). 107 Stat. 312, 387 (1993).

[6] See, 47 CFR §1.2110(g)(2). UC-LP had previously financed the bid deposit through a $5 million secured loan from Inner City Cable Television Systems, Inc. ("Inner City").

Purchase Agreement ("Note Purchase Agreement") pursuant to which UC-NC sold to Gabriel a

15% Senior Note due August 12, 1997, in the principal amount of $8,000,000.00.

To induce Gabriel to enter into and as additional security for UC-NC's payment and

performance under the Note Purchase Agreement, on or about August 12, 1996 UC-LP and

Gabriel and UC-MA and Gabriel, respectively, entered into guaranty agreements (the "Guaranty

Agreements") pursuant to which UC-LP and UC-MA guaranteed the due and punctual

performance of all of UC-NC's obligations to Gabriel under the Note Purchase Agreement and

related documents.

Also on August 12, 1996, each of the Debtors and Gabriel entered into a Security

Agreement (collectively, the "Security Agreements"), pursuant to which each of the Debtors

granted to Gabriel, as collateral security for the payment of all indebtedness and obligations

under the Note Purchase Agreement, first liens and security interests in all of their tangible and

intangible personal property, including any proceeds from the sale of the Licenses. The Security

Agreement for each of the Debtors provides, however, that "[T]o the extent the Holding

Company may be prohibited from granting a security interest in the FCC Licenses pursuant to the

Communications Act or the rules and regulations of the FCC this security interest shall not

encumber the FCC Licenses as opposed to the proceeds that may be derived therefrom."

(Emphasis added.)

On August 12, 1996, UC-LP and Gabriel entered into a Holding Pledge Agreement

("Holding Pledge Agreement"), through which UC-LP pledged, along with related property: (a)

all of its right, title and interest in any equity interest in UC-MA, then existing or thereafter

acquired; and (b) all of its right, title and interest to present and future payments and distributions

relating to such pledged equity interest.

Additionally, on August 12, 1996, UC-MA and Gabriel entered into an Operating Pledge Agreement, under which UC-MA pledged, along with related property: (a) all of its right, title and interest in any equity interest in UC-NC, then existing or thereafter acquired; and (b) all of its right, title and interest to present and future payments and distributions relating to such pledged equity interests. One (1) year later, on August 12, 1997, the Debtors and Gabriel entered into an Amendatory Agreement, pursuant to which the Note Purchase Agreement was amended to provide that Gabriel would purchase from UC-NC an additional fifteen (15%) percent senior note due September 30, 1998 in the amount of $1,000,000.00 (the "New Note"), consolidated with the Senior Note, thereby increasing the aggregate principal amount of UC-NC's debt to Gabriel to $9 million.[7] The Amendatory Agreement provides that the Senior Note and the New Note will bear interest in the amount of fifteen (15%) percent per annum in the absence of the occurrence of any event of default. The Amendatory Agreement further provides that in the event of a default, the principal amount and overdue interest "shall bear interest at a rate per annum equal to the rate of interest applicable to the note plus four percent (4%)."

Gabriel filed separate UCC-1 Financing Statements with the Secretaries of State of the States of Delaware and New York, respectively, on August 15, 1997 (the "Financing Statements"). In each instance, the description of the Collateral in the Financing Statements provides in pertinent part, "[T]o the extent the Holding Company may be prohibited from granting a security interest in the FCC Licenses pursuant to the Communications Act or the rules

---

[7] Gabriel did not actually "purchase" the $1 million senior note. The New Note was given to Gabriel to delay Gabriel's foreclosure of its interest in the Licenses and to give the Debtors additional time to identify a source to financing. No money exchanged hands!!

and regulations of the FCC this security interest shall not encumber the FCC Licenses as

opposed to the proceeds that may be derived therefrom." (Emphasis added.)[8]


**B.    The FCC's First Lien on the Licenses**

On September 17, 1996, the FCC announced that UC-NC had been conditionally granted

the Licenses.  On October 2, 1996, UC-NC received from the FCC security agreements and a

series of promissory notes payable to the FCC (jointly the "FCC Notes") with a total face amount

of $67.2 million in accordance with 47 C.F.R. §24.711(b)(3).  This $67.2 million UC-NC

obligation represented the remaining ninety (90%) percent of the bid for the Licenses after

application of UC-NC's initial ten (10%) percent purchase deposit.  The FCC Notes had a ten

(10) year term and carried an interest rate of six and one-half (6.5%) percent per annum.  On or

about December 17, 1996, UC-NC executed the FCC Notes and the security agreements which

granted the FCC a first lien on and continuing security interest in all of UC-NC's rights and

interest in the Licenses.

## IV.

## CHAPTER 11 FILING

By December 17, 1996, when the FCC issued the Licenses and UC-NC executed the FCC

Notes, the delay in issuing the Licenses, subsequent auctions of three (3) competing blocks of

PCS spectrum, including the "F Block", and other actions had reduced the value of UC-NC's

Licenses to less than twelve and one half (12.5%) percent of the amount for which they had been

auctioned months earlier.  The value of the Licenses, when they were finally issued, was

---

[8] UC-LP is the "Holding Company" referred to in the Description of Collateral.  However, UC-LP never held the Licenses as it, with the FCC's approval, assigned its rights to acquire the Licenses to UC-NC.

disproportionate when compared with UC-NC obligations to (i) the FCC, as evidenced by the

FCC Notes; (ii) Gabriel, as evidenced by the Note Purchase Agreement; and (iii) Inner City, as

evidenced by the Secured Note.  As a result, UC-NC was effectively rendered insolvent by this

transaction as the value of the Licenses was only approximately $9.5 million.[9]

On April 5, 1998, the FCC issued its Second Reconsideration Order[10] which, among

other things, required that all holders of "C and F Block" licenses were required to make their

second interest payment to the FCC on or before October 29, 1998 or their licenses would be

automatically cancelled.[11]

On the October 28, 1998 Petition Date, in an effort to stay the FCC's automatic

cancellation of its Licenses under 47 CFR §1.2110(g)(4)(iv), UC-NC filed its petition instituting

a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of New York (the "Bankruptcy Court"), the day before its second installment

payment on the Licenses was due.  On October 29, 1998, the FCC automatically cancelled the

Licenses and returned the spectrum subject thereto back to the pubic domain.  On November 5,

1998, UC-MA and UC-LP filed their petitions for relief under chapter 11.

On the UC-NC Petition Date, UC-NC's assets consisted solely of its rights with respect

to the Licenses.  UN-NC's secured creditors were the FCC and Gabriel.  After filing, UC-NC

---

[9] An 87.5% reduction in value or 12.5% of the $76 million purchase price from the FCC.

[10] *In the Matter of Amendment of the Commission's Rules Regarding Installment Payment Financing for Personal Communications Services (PCS) Licenses, Second Order on Reconsideration of the Second Report and Order, F.C.C. 99-66, 14 F.C.C.R. 6571 (April 5, 1998)*

[11] The FCC's cancellation of a license is a rather draconian step.  It cuts off any rights of the licensee in or to the license.  The spectrum is placed back in the public domain and reauctioned at a later date.  All of the proceeds of sale realized by the FCC on the reauction become the property of the U.S. Treasury.  The former licensee is often subject to debt collection procedures.  See, 47 CFR §1.2110(g)(4)(iv); *See also, MagnaCom*, at p. 11.  The "licenses cease to exist along with any interest in the spectrum for which the license was issued." *MagnaCom*, at p. 11, citing *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307-308, 123 S. Ct. 832, 154 L. Ed. 2d 863 (2003).

could not effect any transactions to finance the build-out of the PCS system as the FCC had

automatically cancelled the Licenses under the FCC's Rules and Regulations, 47 C.F.R.

§1.2110(g)(4)(iv), on October 29, 1998. The effect of the FCC's cancellation of the Licenses cut

off all rights and interests, including Gabriel's, in the Licenses.

## A.     **Adversary Proceeding Against the FCC**

On February 17, 1999, UC-NC commenced an adversary proceeding in the Bankruptcy

Court against the FCC to (i) void the FCC's automatic cancellation of the Licenses and (ii)

avoid, rescind or reduce UC-NC's debt obligations to the FCC to the fair market value of the

Licenses at the time the FCC Notes were executed on December 17, 1996.

The adversary proceeding was placed on hold pending the outcome of (i) a petition to the

U.S. Supreme Court for a *writ of certiorari* to the United States Court of Appeals for the Second

Circuit by Nextwave Personal Communications, Inc. ("NextWave"), (ii) a petition to the United

States Court of Appeals for the D.C. Circuit by Nextwave, UC-NC and others; (iii) a petition to

the U.S. Supreme Court for a *writ of certiorari* to the D.C. Circuit by Nextwave; and (iv) upon

issuing the *writ*, the Supreme Court's decision in the *Nextwave* chapter 11 case.[12]

---

[12] *Nextwave* was a chapter 11 case in which that debtor, a "C Block" auction winner as well, was forced into chapter 11 by the FCC's actions in the same manner as the Debtors and *MagnaCom* and commenced an adversary proceeding to avoid a substantial portion of its auction bid based, partially, on the reduced value of the licenses. *NextWave* was successful in the Bankruptcy Court, where the Bankruptcy Court avoided eighty-two (82%) percent of the amount of indebtedness, reducing *NextWave's* obligation to the FCC from approximately $4.7 billion to approximately $1.1 billion. A similar remedy was granted to GWI PCS, Inc., another C Block licensee that filed for relief under chapter 11 of the Bankruptcy Code as a result of the FCC's actions with respect to the C Block auction and licensing process. *In re GWI PCS, Inc.*, Adv. Pro. No. 397-3492 (Bankr. N.D. Tx. 1998). The Bankruptcy Court in the *GWI* case found a constructive fraudulent transfer and reduced GWI's obligation under its promissory notes to the FCC by 84.34%. The *Nextwave* and *GWI* courts reduced the obligations of Nextwave and GWI to the FCC upon findings that the value of their licenses, and by implication UC-NC'S licenses, were 82% and 84.34%, respectively, less than the obligations to the FCC. The fair market value of *Nextwave's* licenses was found by the Bankruptcy Court to have been reduced in value from $4.7 billion to $1,023,211,000.00; (*In re Nextwave Personal Communications, Inc.*, 235 B.R. 305 (S.D.N.Y. 1999)) and the fair market value of GWI's licenses was found by that Bankruptcy Court to have been reduced from $1.6 billion to $166 million. *GWI supra* at 794. Supporting UC-NC's claim that Gabriel was an undersecured creditor on the

**B.**    <u>The FCC's Re-Auction of the Licenses</u>

In reliance on the Second Circuit's decision in the *Nextwave* case, and the Rules and

Regulations of the FCC, the Wireless Telecommunications Bureau of the FCC issued a public

notice on September 6, 2000 (the "Public Notice") announcing that an auction, to commence on

December 12, 2000, would include the C and F Block Licenses previously held by UC-NC.

As a result of the FCC's announcement, on October 6, 2000, UC-NC filed a petition with

the FCC for reconsideration of the Public Notice to re-auction UC-NC's Licenses as well as a

Notice of Appeal and a Petition for Review and emergency stay with the United States Court of

Appeals for the D.C. Circuit.  On December 4, 2000, the D.C. Circuit dismissed the petition and

stay motion as "incurably premature" in light of the reconsideration petition before the FCC and

denied *mandamus* relief.  Based upon its cancellation of the Licenses under 47 CFR §1.2110, the

FCC denied UC-NC's petition and proceeded to reauction the Licenses.  The reauction

concluded on January 29, 2001 and the former UC-NC Licenses were auctioned by the FCC to

new bidders.

**C.**    <u>The D.C. Circuit's Nextwave Decision</u>

The D.C. Circuit reversed the FCC's Nextwave decision[13] and remanded, holding that

"the Commission violated section 525 of the Bankruptcy Code in canceling *Nextwave's*

licenses." The Court stated that, "section 525 prevents the Commission, whatever its motive,

from canceling the licenses of winning bidders who fail to make timely installment payments

---

Petition Date is the undisputed fact that the FCC conducted a reauction on March 23, 1999, five (5)
months after the Petition Date, which realized an average bid price per megahertz-pop ("a generally
accepted industry standard which represents the amount paid for a license that would allow the provision
of a particular level of communications data to a particular number of people") of $3,88 per pop.  As UN-
NC's Licenses covered approximately 8.5 million pops, the value of UC-NC's Licenses produced by the
average price per pop at the March 23, 1999 auction multiplied by the number of pops covered by UC-
NC's licenses totaled $32,980,000.00; less than 50% of the FCC's first lien claim on the Licenses.

[13] *Nextwave Personal Communications Inc. v. FCC*, 254 F. 130 (D.C. Cir. 2001).

while in Chapter 11."[14] Because the FCC still had not acted upon UC-NC's Petition for Reconsideration, UC-NC did not have standing to appeal. Instead, UC-NC filed a second Petition for a *Writ of Mandamus* with the D.C. Circuit. This Petition was also denied, but without prejudice to renewal after a decision by the Supreme Court in the *Nextwave* case.[15] The FCC appealed the D.C. Circuit's decision to the United States Supreme Court and, on January 27, 2003, the Supreme Court affirmed the D.C. Circuit's interpretation of Section 525 of the Bankruptcy Code.

**D.**     **The Supreme Court's Decision in Nextwave**

In *FCC v. Nextwave Personal* Communications, *Inc.* 123 S. Ct. 832 (2003) (the "Nextwave Decision"), the United States Supreme Court affirmed the Decision of the D.C. Circuit and held that §525 of the Bankruptcy Code prohibits the FCC from revoking or canceling a debtor's licenses upon the debtor's failure to make full and timely installment payments to the FCC to purchase licenses "and since §525 circumscribes the Commission's permissible action, the revocation of Nextwave's licenses is not in accordance with law." *Id.* at 839.

As a result of the Supreme Court's decision, on September 25, 2003 the FCC issued an Order acknowledging that the FCC's "automatic cancellation rule was ineffective" and restored the Licenses to UC-NC.

### V.

### THE SECURED CLAIMS

**A.**     **The FCC**

On May 28, 1999, the FCC filed a proof of claim in the Bankruptcy Court against UC-NC, asserting a secured claim as of the Petition Date in the amount of $79,673,661.00 (the

---

[14] *Id.* at 155.

[15] *Urban Comm-North Carolina, Inc. v. FCC*, No. 01-1490, (D.C. Cir. March 25, 2002).

"Proof of Claim"), representing UC-NC's outstanding obligation to the FCC for the ninety (90%)

percent of the purchase price for the Licenses remaining after application of the above-

mentioned ten (10%) percent deposit. The FCC also asserted its right under 47 CFR

§1.2110(g)(4)(iv) to receive full payment for the Licenses and other requirements of "C-Block"

bidders, including the accrual of interest.

Over the next five (5) years, UC-NC and the FCC discussed and negotiated various

proposals for the settlement and satisfaction of the FCC's claim, including the tolling of interest

for the period during which the Licenses were cancelled and the spectrum returned to the public

domain. The FCC Settlement Agreement provided for, among other things, (i) a direct payment

of $49,937,276.86 to the FCC at the closing of the SunCom Sale, (ii) a direct payment to the

FCC of $43,676,775.09 at the closing of the Verizon Sale, for a total for (i) and (ii) of

$93,614,051.95, plus, (iii) in each instance, all interest accruing from and including January 1,

2005 through and including the dates of closing.

On March 15, 2005, the Debtors filed their application pursuant to Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Rules") for an Order approving and authorizing the

FCC Settlement Agreement.[16]  On March 23, 2005, Gabriel filed an Objection to the Rule 9019

Motion.[17]  In response, and on March 17, 2005, Gabriel filed Motion of Gabriel Capital L.P. to

Compel Payment of Cash Collateral  Pursuant to 11 U.S.C. §§362(d) and 363(e) (the "Cash

Collateral Motion"). Gabriel argued that a minimum of $21,138,513.69 of the sale proceeds

from the Verizon transaction should be allowed as Gabriel's claim and paid to it as adequate

---

[16] See, Application for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Authorizing and Approving the Terms and Conditions of Debtors' Proposed Settlement Agreement with the Federal Communications Commission, Docket No. 286.

[17] See, Objection of Gabriel Capital L.P. to Debtors' Application for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Authorizing and Approving the Terms and Conditions of Debtors' Proposed Settlement Agreement with the Federal Communications Commission. Docket 296.

protection for the Debtors' release of litigation rights against the FCC to obtain the FCC

Settlement Agreement.

On April 4, 2005, the FCC Settlement Agreement was approved by the Bankruptcy Court

pursuant to Rule 9019. The FCC's secured claim on the Licenses has been fully satisfied during

the course of this chapter 11 case in accordance with the terms of the FCC Settlement

Agreement.

**B.**    **Gabriel's**

On June 1, 1999, Gabriel filed a secured proof of claim in each of the individual chapter

11 cases of UC-NC, UC-MA and UC-LP in the amount $10,739,766.00, plus interest.  Paragraph

6 of the Attachment to each of the proofs of claim provides for treatment of Gabriel's claim as an

unsecured claim to the extent that the collateral security given by the Debtors is insufficient to

satisfy the secured claim.  On March 16, 2005, Gabriel filed amended proofs of claim against

each of the Debtors in the amount of $11,134,451.33, "plus additional amounts per contract" (the

"Amended Proofs of Claim").  On March 23, 2005, UC-NC, UC-MA and UC-LP filed their joint

objection to Gabriel's Amended Proof of Claim and the attachment thereto.

**VI.**

**THE SALE OF THE LICENSES**

**A.**    **SunCom Wireless, Inc.**

UC-NC identified SunCom Wireless, Inc., f/k/a Triton PCS, Inc. ("SunCom"), as a

purchaser of the Licenses in the summer of 2004.  After extensive negotiations, UC-NC and

SunCom concluded that both parties' needs could be satisfied by a sale by UC-MA of all of the

capital stock of UC-NC to SunCom, exclusive of certain Assigned Licenses and Disaggregated

Licenses, for the purchase price of $113,000,000.00.

By Order, dated December 1, 2004, the Bankruptcy Court approved the terms and conditions of the proposed Stock Purchase Agreement (the "SPA"). This transaction, however, was conditioned upon and could not be completed without (i) an agreement between UC-NC and the FCC with respect to the FCC's proof of claim; (ii) regulatory approval of the FCC to the transfer of the shares of UC-NC to SunCom; and (iii) the expiration of the waiting period of the Federal Trade Commission under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended (the "HSR"). The Debtors and the FCC entered into a Settlement Agreement, which was approved by order of the Bankruptcy Court. However, FCC and HSR approval was not received prior to the August 16, 2005 termination date of the SPA and by Stipulation, so-ordered by the Bankruptcy Court on October 4, 2005, the SPA was terminated.

**B.    Cellco Partnership d/b/a Verizon Wireless**

With respect to Verizon, UC-NC structured an asset sale of the Assigned Licenses and Disaggregated Licenses remaining from the SunCom transaction for the purchase price of $68,000,000.00, subject to various terms and conditions, including as a condition precedent, an agreement between UC-NC and the FCC and the FCC's regulatory approval of the transfer of the Assigned Licenses and Disaggregated Licenses to Verizon.

By Order entered on the Bankruptcy Court's record on January 24, 2005 and by written Order, dated March 24, 2005, the Bankruptcy Court authorized and approved the sale of the Assigned Licenses and Disaggregated Licenses to Verizon, free and clear of liens and encumbrances.

UC-NC and Verizon received regulatory approval from the FCC for the sale of the Assigned Licenses and Disaggregated Licenses on June 2, 2005 and closed the transfer of the Assigned Licenses and Disaggregated Licenses on July 13, 2005. As set forth below, UC-NC

paid the FCC approximately $46,000,000 of its $93,614,051 secured claim against the Licenses

and paid $19.5 million to Gabriel as per the Court's directions set forth below.

Prior to that hearing, counsel for the Debtors, Gabriel, the FCC, Verizon and Triton

entered into an interim agreement resolving Gabriel's objection to the Rule 9019 Motion and

providing for an expedited hearing on Gabriel's objection to the Cash Collateral Motion.

The parties agreed as follows:

- A hearing with respect to allowance of the Gabriel Claims would be scheduled

  for April 7, 2005, the outcome of which was outlined above.

- For purposes of the hearing, the Bankruptcy Court would presume that: (i) the

  Verizon Sale and the SunCom Sale, would proceed toward closings and provide

  proceeds of $68.5 million and $113 million, respectively; (ii) the claims of the

  FCC were to be paid in the manner and in the amounts set forth in sections 2 and

  3 of the FCC Settlement Agreement; (iii) upon closing, the proceeds of sale from

  the Verizon and the SunCom transactions, net of payment to the FCC, would

  exceed the maximum amount asserted by Gabriel in the Gabriel Amended Proof

  of Claims.[18]

- The Debtors and Gabriel stipulated that: (i) the Gabriel claims were not less than

  $11,134,451.33 and the Debtors do not object to allowance of the Gabriel Claim

  in that amount and (ii) the Debtors will not assert that the Debtors or their estates

  may recover from any property that may be found to secure Gabriel's claim, or

  from any amount that may otherwise be payable to Gabriel, any costs, expenses,

  or charges pursuant to 11 U.S.C. §506(c).

---

[18] During the intervening two years, each of the Bankruptcy Court's first two presumptions with regard to
the sale of the Licenses occurred.

Since the April 7, 2005 hearing on the status of Gabriel's claim, the Debtors sold or returned all of their Licenses, paid the full amount of the FCC's claim on its senior secured debt and distributed to Gabriel cash in the amount of Gabriel's Minimum Claim Amount (its prepetition claim, plus simple post-petition interest computed at the non-default rate)[19], except for a disputed sum due Gabriel as a result of a computational error made by Gabriel.

## ARGUMENT

### THE BANKRUPTCY COURT ERRED IN HOLDING THAT GABRIEL IS A SECURED CREDITOR

The Bankruptcy Courts' analysis and determination that Gabriel's claims are secured is flawed in many places.  First, there has never been a dispute that on the October 28, 1998 petition date the Licenses had a value a less than the first lien of the FCC, and that the value of the Licenses did not reach Gabriel's, second, lien on the proceeds of sale.  While after restoration as a result of the *Nextwave* decision the Licenses "climbed in value", until the climb reached a value sufficient to cover Gabriel's claim, Gabriel remained undersecured.

The Bankruptcy Courts' retort is that Gabriel's collateral, in addition to the "proceeds" of sale of the Licenses, included the Debtors' "liens on the proceeds of its earlier collateral; on the Debtors' causes of action against the FCC; and on the capital stock of the Debtors' subsidiaries".  Apparently, the Bankruptcy Court equates the value of these rights with the value of the Licenses.  It does not appear that that the Bankruptcy Court was concerned with the fact that (i) this so-called additional collateral belonged to three (3) separate and distinct debtors, (ii) the

---

[19] To date, UC-NC has paid Gabriel approximately $23.3 million.  By its motion, Gabriel is seeking additional payments of approximately $16.82 million for a total payout on a $7,836,250 loan of $40,237,215.00 or a profit of $413.47%.

uniqueness of the collateral, or (iii) the effect of the Communications Act on the cancellation of the Licenses.

## A.    THE RELEVANT DEBTOR AND ASSETS

Although Gabriel and the Bankruptcy Court refer to the Debtors as though they are one entity, these three (3) chapter 11 cases are jointly administered; they are not substantively consolidated.  Thus, in determining the allowance of Gabriel's claim and assessing its claim for post-petition interest under §506(b), only the property securing the loan which belongs to UC-NC – not UC-MA's or UC-LP's properties – can be included in the calculation of value of a secured claim for §506(b) purposes.  See *In re Denofa*.[20]

In the *Denofa* chapter 13 case, the 3rd Circuit did an analysis of §506(a) and (b) and determined that:

"Subsections (a) and (b) work closely together, and one cannot correctly understand and apply the latter before understanding and applying the former.  Section 506(b) only permits post-petition interest where an 'allowed secured claim is secured by property' which exceeds the value of the 'allowed secured claim.'  The meaning of 'allowed secured claim' dictates the outcome here.  Section 506(a) defines an 'allowed secured claim' as a claim secured by 'property in which the estate has an interest...*to the extent of the value of such creditor's interest in the estate's interest in such property[.]*'  11 U.S.C. §506(a) (emphasis added). ...Thus, quite plainly, the 'allowed secured claim' that we must examine for purposes of post-petition interest under §506(b) is limited to the extent of the value of the property of the...bankruptcy estate which secures it.  *See Collier on Bankruptcy* ¶506.04[1] (15th rev. ed. 2003) ("For purposes of section 506(b), a secured claim is 'oversecured' to the extent that the value of the creditors' interest *in the estate's interest in property* is greater than the

---

[20]  124 Fed. Affx. 729 (3rd Cir. 2005).

amount of the creditor's allowed prepetition
claim.") (footnotes omitted) (emphasis added)."

The Debtor's estate that must be examined for purposes of Gabriel's claim to post-petition interest is solely the UC-NC estate; the holder of the Licenses. The assets of UC-MA and UC-LP and their claims in the "bundle of rights" are irrelevant to the determination of "value" for Gabriel's entitlement to post-petition interest. Only the Licenses and litigation rights of UC-NC are relevant to this analysis but also the nature of Gabriel's alleged secured claim must be analyzed.

**B.    GABRIEL HAS A SECURITY INTEREST
SOLELY IN THE PROCEEDS OF SALE
OF THE LICENSES**

The FCC has a policy against a licensee such as UC-NC giving a security interest in a license for spectrum.[21] See, *In re Ridgely Communications, Inc.*[22] ; see also, *In re Kirk Merkley.*[23] Gabriel was aware of this prohibition and knowingly resigned itself to a security interest solely in the proceeds of the ultimate sale of the Licenses. The purpose for the FCC's policy is that the FCC's statutory mandate requires it to approve the qualifications of every applicant for a license. If the holder of a security interest in the Licenses were to foreclose on the

---

[21] "The Commission has consistently held that a broadcast license…is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or other similar property right. See Sections 301, 304, 309(h), 310(d) of the Communications Act, as amended, and Section 73.1150 of the Commissions Rules. See also, Radio KDAN, Inc., 11 FCC 2nd 934, recon. denied 13 RR 2d 100 (1968), affirmed on procedural grounds sub nom., with Hansen v. FCC, 413 F. 2d 374 (D.C. Cir. 1969). As stated in Radio KDAN, "This principle is firmly rooted in Commission practice, its rationale being that such hypothecation endangers the independence of the licensee who is and should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust."

[22] 139 B.R. 374 (Bankr. D. Md. 1992).

[23] 94 FCC 2d 829, 832, 839 (1983).

collateral license, by operation of law, the license could transfer hands without the prior approval of the FCC. This is prohibited. See, *In re Merkley, supra,* at 839.

A security interest such as Gabriel holds in the proceeds of the sale of the Licenses, however, does not violate FCC policy. See, *In re Cheskey.*[24] (When a licensee gives a security interest in the proceeds of the sale of [a license] the licensee's creditor has rights with respect to the money or other assets the licensee receives (proceeds) in exchange for the …license. The creditor has no rights, however, over the license itself, nor can it take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest.) (Emphasis added.)

Interestingly, section 9-315(c) of the Delaware Code annotated provides that "a security interest in proceeds is a perfected security interest only if the security interest in the original collateral was perfected." See, In *re Churchill Mortgage Investment Corp.*[25]; see, also, *New York Commercial* Code §9-315 (formerly 9-306s) ("no security interest attaches to proceeds unless the security interest in the foreclosed collateral was perfected.") While it would appear, at least with respect to Delaware Code section 9-315 (c), that a security interest in proceeds from the sale of the Licenses is not possible without a security interest also being taken in the Licenses themselves, this statute is clearly at odds with the holding in *In re Ridgley*[26], which recognizes the right of a creditor to perfect a security interest in a debtor's licenses, limited to the extent of the licensee's proprietary rights in the license vis-à-vis private third parties. The effect of the perfection of a security interest in the licensee's proprietary rights (proceeds) is essentially for purposes of notice to any subsequent creditors seeking to encumber proceeds and, more

---

[24] 9 FCC Res 986, 987 (1994).

[25] 233 B.R. 61, 69 (Bankr. S.D.N.Y. 1999).

[26] 139 B.R. 374, 378-379 (Bankr. D. Md. 1992).

importantly, for protection from being primed by the liens and claims of subsequent creditors.

See, *MLQ Investors, L.P. v. Pacific Quadracasting, Inc.*[27]; see also, *In re Ridgeley*, supra at 379.

**C.    §506(B) PROHIBITS THE PAYMENT
OF INTEREST TO GABRIEL ON ITS CLAIM**

Under the circumstances of the instant case, however, UC-NC's Licenses, unlike the

licenses in *MLQ and Ridgley*, were <u>cancelled</u> by the FCC pursuant to 47 CFR 1.2110(g)(4)(iv)

leaving UC-NC with no proprietary rights in the Licenses after its default on its obligation to the

FCC.  Upon cancellation of the Licenses, UC-NC had absolutely no rights with respect to the

cancelled Licenses as the spectrum was placed back in the public domain for reauction by the

FCC.  Any proceeds derived from a subsequent sale of the reauctioned Licenses became property

of the U.S. Treasury, and UC-NC was not entitled to any excess proceeds above the liens of the

FCC realized from the reauction of the cancelled Licenses.  Because Gabriel's rights with respect

to the proceeds of sale of the Licenses are derived through UC-NC, when UC-NC's interest in

the Licenses vanished upon cancellation, Gabriel's claim to the proceeds from the sale of the

Licenses vanished as well, for UC-NC no longer held any rights with respect to the Licenses or

the proceeds therefrom.  Consequently, Gabriel's perfected security interest it the proceeds of

sale had nothing to attach itself to.   In *In re Magnacom Wireless, LLC*[28] the Ninth Circuit Court

of Appeals dealt directly with this issue.  The Ninth Circuit held on almost identical facts on this

issue as follows:

*       *       *

> "…Under *47 U.S.C. § 301,* licenses "provide for the use" of
> the spectrum, "but not the ownership thereof."  In other
> words, <u>licensees have a property interest only in the use of
> the spectrum, not in the underlying spectrum itself.</u>

---

[27]  146 F.3d 746, 748 (9th Cir. 1998).

[28]  *Thacker v. FCC*, 2007 U.S. App. Lexis 22151.

Moreover, *§ 301* provides that the property interest created by a license is limited to "the terms, conditions, and periods" of the license itself. *Id.* Consistent with the Act, the Security Agreement states that licenses are extinguished upon non-payment, and convey no rights to the underlying spectrum. See, *Security Agreement*, P. 2; see also, *47 C.F.R. § 1.2110(g)(4)(iv)* ("If an eligible entity obligated [\*12] to make installment payments fails to pay the total Required Installment Payment . . . it shall be in default, its license shall automatically cancel, and it will be subject to debt collection procedures."). Because licenses "provide for the use" of the spectrum and convey no ownership interest "beyond the terms, conditions, and periods of the license, *47 U.S.C. § 301*, it follows that once the licenses are cancelled for nonpayment, the licenses cease to exist along with any interest in the spectrum for which the license was issued. *See FCC v. Nextwave Pers. Commc'ns Inc., 537 U.S. 293, 307-08, 123 S. Cr. 832, 154 L. Ed. 2d 863 (2003)* (describing cancellation as "eliminating the license"). Thus, under the plain language of the statute and applicable regulations, once an FCC license is cancelled, a licensee no longer has any right derived from that license and therefore has no entitlement to the proceeds from the auction of a new license. (Emphasis added.).

*         *         *

In sum, under *47 U.S.C. § 301*, once Magnacom's licenses were cancelled by the FCC, Magnacom's licenses had no value and Magnacom's interest in the underlying spectrum was extinguished. This valueless asset could not generate any traceable proceeds for purposes of the Bankruptcy Code...." (Emphases added.)

*         *         *

Contrary to the Bankruptcy Court's findings, *Magnacom* is right on point with the instant case. *Magnacom* is about the legal effect of the FCC's cancellation of a debtor's licenses on the proceeds from the sale of those licenses after the cancellation. Applying the Ninth Circuit's reasoning to this case, once the FCC cancelled UC-NC's Licenses, UC-NC's Licenses had no

value and "the underlying spectrum was extinguished. This valueless asset could not generate any traceable proceeds for purpose of the Bankruptcy Code."

By definition, 'secured claim' requires availability of collateral to secure the creditor's right to payment. *In re Elliott, 64 Bankr.* 429, 430 (Bankr. W.D. Mo. 1986). Gabriel claims to have possessed a security interest in the proceeds from the sale of the Licenses throughout the UC-NC chapter 11 case, even during the period that the Licenses were cancelled and the underlying spectrum in the possession of the public domain and the FCC. This is demonstratively flawed reasoning. Gabriel's only security from UC-NC is its lien on the proceeds of sale of the Licenses. However, while Gabriel may be secured by future sale proceeds, until those proceeds were realized, Gabriel's security interest in the proceeds of sale of the Licenses was merely for protection of its priority. At best, Gabriel's security interest could only attach when the Licenses yield proceeds of sale. Gabriel is seeking treatment as an oversecured creditor when its collateral was cancelled at the time of cancellation of the Licenses. "…[A]claim paid the amount it would receive if secured, but without access to the underlying collateral, would simply be an unsecured claim paid on a priority basis outside the statutory priority scheme." *In re* Elliott at 430. See also, *In re Gabor*[29], citing *In re Emarco*[30], where that Court concluded that "although a creditor may have a security interest in missing collateral, as to such collateral, the creditor could not have a secured claim…" (Emphasis added.) *Elliott* at 430.

It logically follows here with respect to non-existent proceeds from the future sale of cancelled Licenses, that while Gabriel's security interest in its collateral may survive, Gabriel's status as a secured creditor in UC-NC's chapter 11 case does not. A creditor such as Gabriel

---

[29]  155 B.R. 391, 393 (Bankr. N.D. W. Va. 1993).

[30]  45 Bankr. 627, 629 (Bankr. W.D. Pa. 1985).

holding a security interest in property which UC-NC cannot produce is not a secured creditor in the UC-NC's chapter 11 case. See, *In re Gilsinn*[31], citing *In re Elliott* at 430.

During the period October 29, 1998 through September 23, 2003, when the Licenses were cancelled by the FCC, the UC-NC estate's interest in the Licenses, underlying spectrum and proceeds of sale was zero. Since the FCC cancelled the Licenses and returned the spectrum to the public domain, the proceeds of sale of which was the source of money securing the repayment of Gabriel's loan, UC-NC obviously could assign no value to this collateral at all. The value of Gabriel's interest in the interest of the UC-NC estate from the standpoint of security was also zero. UC-NC nor Gabriel could look any longer to the disposition of the Licenses to repay Gabriel's claim. Gabriel could not look to any specific asset of UC-NC for payment of its claim. *Emarco* at 628.

Based on the above, under §506(b) Gabriel is clearly not entitled to post-petition interest on its claim. Section 506(b) allows interest only to an oversecured creditor. Section 506(b) provides, in pertinent part: "To the extent that an allowed secured claim is secured by property the value of which... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim . . . ." Section 506 has the concomitant "substantive effect of denying undersecured creditors postpetition interest on their claims. See *United Savings Association of Texas v. Timbers of Inwood Forest Association, Ltd.*[32].

Gabriel has never been an oversecured creditor in the instant case, as the value of their security interest could not possibly be determined other than zero, until proceeds came into existence. Furthermore, it must be taken into consideration for the purposes of valuing Gabriel's collateral that Gabriel's security interest in proceeds from the sale of the Licenses happens to be

---

[31]  224 B.R. 710, 713 (E.D. Mo. 1997).

[32]  484 U.S. 365, 372 (1988).

in very *specific* proceeds.  Not only do these proceeds have to come into being before Gabriel's security interest can attach or be adequately valued, the proceeds that Gabriel has a perfected security interest in are those proceeds that are above the FCC's very substantial $93 million first lien encumbrance on the Licenses themselves.  In other words, Gabriel's security interest does not automatically spring into being upon the first appearance of proceeds.  It's claim to proceeds were subordinate to the FCC's superior claim to proceeds of sale of the Licenses as the holder of a first lien on the Licenses.  Also, what cannot be ignored is that for a substantial period of time commencing on the UC-NC Petition Date, the value of the Licenses were significantly less than the FCC's claim secured thereby.  In fact, on the UC-NC Petition Date, the Licenses were only worth approximately half of the FCC's claim.  (See footnotes 6 and 9.)  This fact, coupled with the cancellation of the Licenses and the FCC's right to appropriate the proceeds of sale for the U.S. Treasury, renders Gabriel's characterization of itself as an oversecured creditor entitled to post-petition interest, untenable.

The Bankruptcy Court has attempted to analogize Gabriel's position in this chapter 11 case to that of the creditors in *Ford Motor Credit Co.* and *Alpine*, when the fact is that Gabrie'sl position is, in fact, closely similar to the Trustee in the *Magnacom* case.  The *Ford Motor Credit Company* case held that when collateral securing a claim has been sold, Bankruptcy Courts should use the sale price, not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to post-petition interest under Sec. 506(b).  The Bankruptcy Court also adopted this position.  While the FMC holding may bode well for a creditor who has held a continuous security interest in the collateral or res itself, the sale of which may render the creditor's claim oversecured thus entitling it to post-petition interest under 506(b), the same

analysis cannot be applied to a creditor such as Gabriel who has no security interest in the Licenses, the collateral or the *res*, but only in the proceeds from the sale of such collateral or res.

In both the *FMC* and *Alpine* cases, the creditors' claims were secured by both the collateral and the proceeds from the disposition of the collateral. Collateral and proceeds, in the context of Gabriel's claim are not synonymous. For example, the collateral at issue in *FMC* maintained a calculable value from the time the security interest in the collateral was given to the time it was sold. The value of the collateral in that particular case happened to diminish leaving the creditor there significantly undersecured. However, due to the nature of the collateral and the creditor's security interest therein, at no point was the collateral valueless or the creditors unsecured. In the instant case, UC-NC recognizes the existence of Gabriel's security interest in the proceeds of sale of the Licenses. UC-NC merely posits that, for valuation purposes, Gabriel's security interest in the proceeds of sale of the Licenses is not really a secured claim at all as the spectrum was returned to the public domain and any proceeds are non-existent until the spectrum is returned to the Licenses and a transfer of the Licenses yield proceeds in excess of the FCC's secured claim on the Licenses. In accordance with the holding in *FMCC* and *Alpine*, Gabriel becomes oversecured, if at all, at the time the proceeds of sale come into existence and not a moment prior. If post-petition interest is to be applied at all, it must only accrue from the date Gabriel's status as an oversecured creditor become established, which can only be determined on the date the Licenses are sold and the proceeds of sale are realized.

The instant case is further distinguished from *FMCC* and *Alpine* by the fact that the collateral (the Licenses) that gave rise to the proceeds of sale were cancelled pursuant to FCC regulations. Consequently, as of the date of the cancellation of the Licenses, UC-NC's interest in the Licenses and Gabriel's interest in the estates' interest in the Licenses was zero, leaving

Gabriel, who was not secured except with respect to the proceeds, with an unsecured claim as the Licenses and any proceeds upon reauction were no longer a part of UC-NC's chapter 11 estate.

**D.    THE FCC'S CANCELLATION OF THE LICENSES
        ALSO CANCELLED GABRIEL'S LITIGATION RIGHTS**

In its preliminary determination, the Bankruptcy Court articulated that it was "materially affected by the 'bundle' of available assets that comprised Gabriel's collateral," which, in the Bankruptcy Court's assessment, would be relevant irrespective of considerations dealing with the valuation of the collateral.  This bundle of assets included UC-NC's, UC-MA's and UC-LP's "litigation rights against the FCC as manifested both by those litigation rights themselves and as they affected the value of the securities, the equity securities which were pledged into favor of Gabriel and which…the three Urban Comm entities…continued to retain."  The Bankruptcy Court concluded by referencing the Supreme Court's decision in *Nextwave*, and opined that "one could not ignore the value of those litigation rights or the value of the common stock of the three entities whose stock was pledged."

To reiterate, the Licenses, the proceeds of which in excess of the FCC's claim are encumbered by Gabriel, were granted solely to UC-NC.  As set forth above, although UC-NC's chapter 11 case is jointly administered with the chapter 11 cases of UC-MA and UC-LP, UC-MA and UC-LP are third parties to the Gabriel transaction and their assets cannot be considered for purposes of determining whether under §506(b) Gabriel's claim against UC-NC is entitled to the payment of interest.  In *Denofa* the 3rd Circuit held that "only property securing the loan which belonged to the bankruptcy estate-and not third party property securing the loan-could be

included in a calculation of the value of secured property for purposes of assessing a claim for post-petition interest under sec. 506(b)." UC-MA and UC-LP are considered third parties for purposes of this analysis and any property they pledged as additional collateral securing Gabriel's claim cannot be included in any calculation of the value of the collateral securing Gabriel's claim for purposes of assessing post-petition interest against UC-NC under §506(b).

In addition, the Bankruptcy Court failed to take into consideration the fact that, with respect to litigation rights against the FCC, only UC-NC, possesses a theoretical private right of action against the FCC. However, no private right of action for money damages exists under §525 of the Bankruptcy Code, the provision that the FCC violated when it automatically cancelled the Licenses. The Bankruptcy Court in *In re Taylor*[33] addressed the dual issue of whether a private right of action exists under § 525(c)(1) for money damages and discussed the scope of section 105(a) in the context of creating a private right of action and awarding damages against violators of § 525. That Court determined that "no private right of action exists under § 525(c)(1) for money damages [as the plain language of the section] does not provide clear evidence of Congress' intent to create a private right of action to impose damages pursuant to § 525(c)(1)." The *Taylor* Court also determined that § 105(a) cannot be used to create substantive rights that are not explicitly created in Title 11. *Taylor*, citing *Bessette v. Avco Financial Services, Inc.*[34] See also, *In re Joubert*[35], citing *In re Continental Airlines*[36] with respect to §105(a) and §524.

---

[33]  263 B.R. 139 (N.D.Ala. 2001).

[34]  240 B.R. 147, 156 (D.R.I. 1999).

[35]  411 F.3d 452 (3d Cir. 2005).

[36]  203 F.3d 203 (3d Cir. 2005).

## CONCLUSION

The automatic cancellation of the Licenses by the FCC on October 29, 1998 and the transfer of the underlying spectrum to the public domain also canceled Gabriel's right to the proceeds of sale of the Licenses.  While Gabriel continued to hold a security interest in the proceeds of sale, until a transfer occurred which yielded proceeds in excess of the encumbrances on the Licenses, Gabriel was an unsecured creditor prohibited by §506(b) of the Bankruptcy Code from receiving interest on its claim.    Gabriel's Amended Proof of Claim should have been allowed in the Bankruptcy Court solely to the extent of the $11,134,451.33 which was owed to it by UC-NC on the UC-NC Petition Date and in all other respects should have been disallowed by the Bankruptcy Court.

Dated:  New York, New York
          February 27, 2008

**WINDELS MARX LANE & MITTENDORF, LLP**

**By:**    **/s/ Charles E. Simpson**
          **Charles E. Simpson (CES-2130)**
          **A Member of the Firm**

156 West 56th Street
New York, New York 10019
(212) 237-1000

Attorneys for Appellants, Urban Communicators PCS
Limited Partnership, et al., Debtors-in-Possession

{10439967:2}                                         29