UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                          :    Chapter 11
In re:                                    :    Case Nos.  98-B-47996 (REG)
                                          :                    98-B-47997 (REG)
URBAN COMMUNICATORS PCS LIMITED           :                    98-B-10086 (REG)
PARTNERSHIP, *et al.*,                    :
                                          :    Jointly Administered
                          Debtors.        :
------------------------------------------------------------- x
URBAN COMMUNICATORS PCS LIMITED           :
PARTNERSHIP, et al., Debtors              :
                                          :    08-CIV-00502 (RWS)
                          Appellants,     :
                                          :
        - against -                       :
                                          :
GABRIEL CAPITAL, L.P.                     :
                                          :
                          Appellee.       :
------------------------------------------------------------- x


**BRIEF OF GABRIEL CAPITAL L.P. IN OPPOSITION TO DEBTORS' APPEAL
FROM THE BANKRUPTCY COURT'S DECISION AND ORDER ON GABRIEL
ENTITLEMENT TO POST-PETITION INTEREST ENTERED DECEMBER 11, 2007**

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David M. Friedman (DF 4278)
Robert M. Novick (RN 4037)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel to Gabriel Capital L.P.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

I.      INTRODUCTION ............................................................................ 1

II.     APPELLANTS' BRIEF IS DEFICIENT ........................................ 3

III.    COUNTER-STATEMENT OF ISSUE PRESENTED ON APPEAL ............................... 4

IV.     APPELLEES' STATEMENT OF STANDARD OF APPELLATE REVIEW ................ 4

V.      COUNTER-STATEMENT OF THE CASE .......................................... 5

VI.     ARGUMENT...................................................................................... 9

        A.      Statutory Framework ....................................................... 9

        B.      Gabriel Had, and Has, a Perfected Security Interest. ........................... 9

        C.      The Collateral Must Be Valued at the Time of Its Disposition............................ 14

CONCLUSION .......................................................................................... 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Alpine Group, Inc.*, 151 B.R. 931 (9th Cir. B.A.P. 1993)....................................................16

*In re Cheskey*, 9 FCC RCS 986 (1994) ...............................................................................10, 11

*Dewsnup v. Timm*, 502 U.S. 410, 116 L. Ed. 2d 903, 112 S. Ct. 773 (1992)............1, 3, 14, 16, 17

*In re Faraldi*, 286 B.R. 498 (E.D.N.Y. 2002) ..........................................................................4

*FCC v. NextWave Personal Communications Inc.,* 537 U.S. 293 (2002) .......................................6

*In re Ford Motor Credit Co.*, 35 F.3d 860 (4th Cir. 1994)..........................................................16

*In re Grothues*, 226 F.3d 334 (5th Cir. 2000)...........................................................................3

*In re Jonick Deli Corp.*, 263 B.R. 196 (S.D.N.Y. 2001) ............................................................4

*In re Mitchell*, 81 B.R. 171 (Bankr. D.D.C. 1988) ..................................................................15

*MLQ Investors, L.P. v. Pacific Quadrasting, Inc.*, 146 F.3d 746 (9th Cir. 1998)..........................10

*Morrisey v. Stuteville*, 349 F.3d 1187 (3d Cir. 2003)..................................................................3

*In re National Computer Comm. Corp.*, 85 B.R. 6 (Bankr. D. Conn. 1988)................................15

*NextWave Personal Communications Inc.,* 254 F.3d 130 (D.C. Cir. 2001)....................................6

*Rake v. Wade*, 508 U.S. 464 (1993)........................................................................................9

*In re Reilly*, 245 B.R. 768 (B.A.P. 2d Cir. 2000) ......................................................................4

*In re Ridgely Communications, Inc.*, 139 B.R. 374 (Bankr. D. Md. 1992)..................................10

*In re Stoller's Inc.*, 93 B.R. 628 (Bankr. N.D. Ind. 1988) .........................................................15

*Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.),*
   151 B.R. 931 (Bankr. 9th Cir. B.A.P. 1993) ......................................................................15

*Thacker v. FCC (In re Magnacom Wireless, LLC)*, 2007 U.S. App. Lexis 22151 ......................13

*In re Two "S" Corp.*, 875 F.2d 240 (9th Cir. 1989)...................................................................15

*In re Vebeliunas*, 332 F.3d 85 (2d Cir. 2003)............................................................................4

**Page**

**Statutes**

11 U.S.C. § 506(b)......................................................................................2, 4, 8, 9, 14, 15

11 U.S.C. § 506(c)......................................................................................8

11 U.S.C. § 525 .........................................................................................6

UCC § 9-102(42).......................................................................................12

**Other Authorities**

4 COLLIER ON BANKRUPTCY, 506.03[6][b] at p. 506-43 (15th Ed. Rev.) ......................................14

**Rules**

Fed. R. Bankr. P. 8013.................................................................................3, 4

Gabriel Capital L.P. ("**Gabriel**"), by its undersigned counsel, respectfully submits this Brief in Opposition to the Debtors' Appeal from the *Decision and Order on Gabriel Entitlement to Post-Petition Interest* (the "**Bankruptcy Court Order**"), entered December 11, 2007 (Docket No. 496[1]) by the Honorable Robert E. Gerber in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in the above-referenced chapter 11 bankruptcy cases (the "Cases").

## I.

## <u>INTRODUCTION</u>

The Debtors' Appeal ultimately boils down to a single question of law: Whether an increase in the value of collateral securing a loan during bankruptcy accrues to the benefit of the secured creditor or to the benefit of the debtor and its equity holders. That question is easily answered. The Supreme Court in *Dewsnup v. Timm*, 502 U.S. 410, 116 L. Ed. 2d 903, 112 S. Ct. 773 (1992) (*"**Dewsnup**"*) held that post-petition increases in the value of collateral accrue to the benefit of the secured creditor. Numerous other decisions are in accord.

Consistent with *Dewsnup*, the Bankruptcy Court Order held that Gabriel is an oversecured creditor entitled to post-petition interest because the property securing Gabriel's claim, while possibly of modest value at the inception of the bankruptcy case, was eventually liquidated for over $140, enough to pay the Debtors senior secured debt to the FCC and leave over tens of millions of dollars more than the principal amount of Gabriel's claim.

Gabriel holds claims, for money loaned, against each of the three Debtors: Urban Comm-North Carolina, Inc. ("**UC-NC**"); UC-NC's equity holder, Urban Comm-Mid-Atlantic Inc. ("**UC-MA**"); and UC-MA's equity holder, Urban Communicators Partnership PCS ("**UC-LP**").

---

[1] Items in the record on appeal are cited to herein by their Bankruptcy Court docket number.

Gabriel's claims are secured by *all* assets of *each* Debtor, with one limited exception: Gabriel security interest did not attach to the FCC Licenses (defined below) previously owned by UC-NC to the extent such a security interest would not have been permitted by law. Gabriel was, however, granted a security interest in the *proceeds* of the FCC Licenses, along with all other assets of each Debtor.

As of the Petition Date[2], Gabriel held a stipulated allowed claim in the amount of $11,134,451.33 (the **"Petition Date Claim Amount"**). During the course of these Cases, UC-NC sold its FCC Licenses in several transactions that netted the estates more than $50 million after repaying in full the FCC's senior secured claims. By virtue of Gabriel's liens on all of the assets of each Debtor (other than, for argument's sake, the FCC Licenses) which have now been liquidated for more than $50 million net of obligations to the FCC, Gabriel is vastly oversecured and entitled to receive post-petition interest pursuant to 11 U.S.C. § 506(b). The Bankruptcy Court so held.[3]

The Debtors seek to pay Gabriel <u>only</u> the Petition Date Claim Amount (*see* Appellants' Brief at 29), without any post-petition interest, to enable them to distribute a maximum amount of their cash to their equity interest holders (most of whom are, not coincidentally, insiders). To accomplish this, the Debtors argue that Gabriel's claims should be treated as *under*secured by reason of either (a) the allegedly depressed value of the FCC Licenses as of the Petition Date (of which there is no evidence in the record) or (b) the FCC's subsequent invalid and failed attempts to cancel the Licenses. However, *Dewsnup* and many other authorities foreclose those

---

[2] Capitalized terms used herein and not defined herein are intended to have the meaning ascribed to such terms of the "Appellants' Brief" filed by the Debtors.

[3] Whether the Bankruptcy Court properly computed the rate of interest is the subject of Gabriel's appeal from the Bankruptcy Court's order, pending before this Court as cases 08 Civ 00945, 08 Civ 00946 and 078 Civ. 00947 (the **"Related Appeals"**).

arguments and support the Bankruptcy Court's rulings on these issues. The Bankruptcy Court

therefore should be affirmed with respect to the issues raised in the Debtors' Appeal.

## II.

## APPELLANTS' BRIEF IS DEFICIENT

Federal Bankruptcy Rule 8010(a)(1) requires that, in the absence of a contrary local rule,

the brief of the appellant shall contain, under appropriate headings, a statement of the basis of

appellate jurisdiction and a statement of the applicable standard of appellate review. Fed. R.

Bankr. P. 8010(a)(1)(B),(C). The Appellants' Brief is missing statements of the basis of

appellate jurisdiction and the applicable standards of appellate review.

In addition, an appellant's brief is required to contain a statement of the issues presented.

The Appellants' Brief has a section titled "Question Presented" but sets forth, as one of two

questions presented, whether the Bankruptcy Court erred in "failing to apply New York's law on

usury on Gabriel's claim for interest. . . ." That is not a issue presented on appeal. The Debtors

did not argue usury before the Bankruptcy Court at any time during the nine years these Cases

have been pending. The Debtors did not identify this issue in their Statement of Issue on Appeal,

as required by Fed. R. Bank. P. 8006, which they filed with the Bankruptcy Court on December

28, 2007 [Docket No. 501]. The Debtors also did not brief the issue in any way in the

Appellants' Brief, which additionally is a violation of Fed. R. Bankr. P. 8010(a)(1)(E) (brief

shall contain an "argument [that] shall contain the contentions of the appellant with respect to the

issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of

the record relied on").

The Court has discretion to dismiss an appeal if it finds the appellant's brief egregiously

violated Bankruptcy Rule 8010. *See Morrisey v. Stuteville*, 349 F.3d 1187, 1190 (3d Cir. 2003).

In addition, issues not addressed in a brief may be considered waived. *In re Grothues*, 226 F.3d

334 (5th Cir. 2000). Certainly no usury issues are properly before this Court on appeal. Gabriel relies upon the Court's discretion to determine if any action is appropriate with respect to the other deficiencies in the Debtors' brief.

## III.

## COUNTER-STATEMENT OF ISSUE PRESENTED ON APPEAL

Whether the District Court should affirm the Bankruptcy Court's ruling that collateral securing Gabriel's claims should be valued at the time of its liquidation, rather than some other hypothetical date, for purposes of determining that Gabriel is entitled to interest under 11 U.S.C. § 506(b) as an oversecured creditor.

## IV.

## APPELLEE'S STATEMENT OF STANDARD OF APPELLATE REVIEW

A district court reviews a bankruptcy court's conclusions of law *de novo*. *In re Jonick Deli Corp.*, 263 B.R. 196, 198 (S.D.N.Y. 2001); *In re Faraldi*, 286 B.R. 498, 501-02 (E.D.N.Y. 2002). The same standard of review applies to a bankruptcy court's conclusions on mixed questions of fact and law. *In re Reilly*, 245 B.R. 768, 772-73 (B.A.P. 2d Cir. 2000) (holding "[w]hen mixed questions are raised on appeal, they are presumptively subject to *de novo* review" which "affords no deference to a trial court's determination" and allows the reviewing court "to decide the issue as if no decision had been previously rendered"); *In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003) ("Mixed questions of fact and law are subject to *de novo* review"). Findings of fact made by a bankruptcy court may be set aside where clearly erroneous. *See* Fed. R. Bankr. P. 8013. Gabriel submits that the issues raised on the Debtors' Appeal are issues of law.

**V.**

**COUNTER-STATEMENT OF THE CASE**

With only a few exceptions, the material facts underlying the Appeal were not in dispute below. The Bankruptcy Court did not conduct an evidentiary hearing to reach the rulings set forth in the Bankruptcy Court Order. As a general matter, Gabriel does not dispute the Debtors' statement of the case, to the extent it is relevant to the issue on appeal, except as noted below.

To make a required 10-percent down payment for the acquisition of certain radio wave spectrum licenses from the FCC (the **"FCC Licenses"**), UC-NC and the other Debtors entered into a series of related agreements on or as of August 12, 1996, pursuant to which Gabriel loaned the principal amount of $8,000,000 to UC-NC. Bankruptcy Court Order at 5. Each Debtor granted Gabriel a security interest in all of its tangible and intangible property to the extent permitted by law. *Id*. at 6. Arguably, "the extent permitted by law" excluded a direct security interest in the Licenses, but *included* a security interest *in the proceeds of a sale of the Licenses. Id.* The Debtors agree with that proposition. *See* Appellants' Brief at 6, 7, 29. On or as of August 12, 1997, Gabriel and the Debtors agreed on terms for a restructuring of the Debtors' obligations to Gabriel that, among other things, increased the aggregate principal amount of UC-NC's debt to Gabriel to $9 million. Docket No. 292; Docket No. 358; Bankruptcy Court Order at 7, 12.

The Appellants' Brief posits that the FCC Licenses were worth approximately $9.5 million on the Petition Date. (*See* Appellants' Brief at 9.) However, the Bankruptcy Court did not receive any evidence as to the value of the Licenses as of any particular date, except for the amounts for which the Licenses were actually sold in sale transactions that were authorized and approved by the Bankruptcy Court.

5

Subsequent to the Petition Date, the FCC *asserted* that the Debtors' Licenses were cancelled. However, the FCC did not *succeed* in that assertion. The Court of Appeals for the District of Columbia Circuit, and subsequently the Supreme Court, held that 11 U.S.C. § 525 (the automatic stay) prohibited the FCC from canceling the Licenses and that the FCC's efforts to do so were contrary to law. *See FCC v. NextWave Personal Communications Inc.,* 537 U.S. 293 (2002); *NextWave Personal Communications v. FCC,* 254 F.3d 130 (D.C. Cir. 2001).

As a result, the FCC acknowledged that its cancellation **was ineffective.** *See* Appellants' Brief at 12. Consequently, UC-NC succeeded in retaining its FCC Licenses. UC-NC sold most of the FCC Licenses to third parties such as a Verizon affiliate for over $140 million in cash. Appellants' Brief at 14-17; Docket Nos. 302, 374, 380, 397. The Debtors concede that "as a result of the *NextWave* decision, the Licenses 'climbed in value', until the climb reached a value sufficient to cover Gabriel's claim. . . ." Appellants' Brief at 17.[4]

From the various sale proceeds, the Debtors repaid the FCC in full, paid several million dollars (nearly all) of their expenses of bankruptcy administration, repaid their Chairman's undocumented loans to the Debtors (with 15% interest), and made partial payments to Gabriel. The Debtors are presently holding approximately $21 million of cash. They conduct no operations other than managing their bankruptcy Cases, which primarily consist of litigating Gabriel's entitlement to interest.

On June 1, 1999, Gabriel timely filed a proof of claim against each of the Debtors [Docket No. 292, Ex. K, L and M]. Gabriel filed amended proofs of claim against each Debtor

---

[4] This is not strictly accurate. The value of the Licenses' was determined by market conditions for licenses. The Debtors' entitlement to retain the Licenses, and in turn their proceeds, was resolved by the *NextWave* decision.

on March 16, 2005 [Docket No. 292, Ex. N, O and P] in order to update Gabriel's computation of its rights to postpetition interest.

On March 17, 2005, Gabriel filed the *Motion of Gabriel Capital L.P. to Compel Payment of Cash Collateral Pursuant to 11 U.S.C. §§ 362(d) and 363(e)* (the **"Cash Collateral Motion"**), through which Gabriel sought to compel the Debtors to distribute to Gabriel the portion of the proceeds of a license sale pursuant to sections 362(d) and 363(e) of the Bankruptcy Code.

On March 16, 2005, the Bankruptcy Court conducted a pre-motion conference (the **"March 16th Conference"**) with Gabriel, the Debtors and the FCC to discuss the scheduling the Cash Collateral Motion *vis-à-vis* the Debtors' Federal Bankruptcy Rule 9019 motion to approve a settlement with the FCC (the **"FCC Settlement"**) that was pending at the time. During the March 16th Conference, the Debtors contended that Gabriel is precluded from being treated as a secured creditor and entitled to no postpetition interest by reason of the FCC's ultimately ineffective attempts to cancel the FCC Licenses. On March 22, 2005, the Debtors filed the *Opposition to the Motion of Gabriel Capital L.P. to Compel Payment Pursuant to 11 U.S.C. §§ 362(d) and 363(e) of the Bankruptcy Code*.

On March 23, 2005, Gabriel filed an objection to the Debtors' application for an order approving the FCC Settlement Agreement. The bases for Gabriel's objection included that the FCC Settlement Agreement purported to compel Gabriel to release any third-party claims it had against the FCC relating to the FCC's invalid attempt to cancel the FCC Licenses, while the Debtors were simultaneously asserting that the FCC's actions somehow destroyed Gabriel's security interest in the proceeds of the FCC Licenses.

To resolve Gabriel's objection, the Debtors and Gabriel stipulated at a March 24, 2005 proceeding before the Bankruptcy Court that: (i) Gabriel's claims are not less than the Petition

Date Claim Amount and the Debtors do not object to allowance of Gabriel's claims in such

amount; (ii) the Debtors will not assert that the Debtors or their estates may recover from any

property that may be found to secure Gabriel's claim, or from any amount that may otherwise be

payable to Gabriel, any costs, expenses, or charges pursuant to 11 U.S.C. § 506(c); (iii) Gabriel's

claims are not subject to any counterclaims, defenses, offsets or subordination, except that the

Debtors contest whether Gabriel's claims are secured claims entitled to post-petition interest and,

in the event they are found to be secured claims, the proper measure of interest; and (iv) the

Debtors would pay Gabriel the prepetition claim amount together with such interest that the

Court may determine Gabriel is entitled to from the License sale proceeds, subject to

disgorgement in the event the amount should be reduced on appeal.

Additionally, the Bankruptcy Court scheduled an expedited hearing on the issues of

whether Gabriel's claims are secured and, if so, whether Gabriel's post-petition interest accrues

at the default rate provided by the Financing Agreements.  Gabriel and the Debtors subsequently

submitted a series of briefs addressing these issues, participated in a lengthy oral argument on

April 7, 2005 (at which time the Bankruptcy Court issued a bench decision that Gabriel's claim

is oversecured), and several brief additional colloquies over the next two and a half years.  On

December 11, 2007, the Bankruptcy Court issued the Bankruptcy Court Order.

# VI.

## ARGUMENT

**A.    Statutory Framework.**

Section 506(b) of the Bankruptcy Code provides in relevant part that:

> To the extent that an allowed secured claim is secured by property
> the value of which . . . is greater than the amount of such claim,
> there shall be allowed to the holder of such claim, interest on such
> claim, and any reasonable fees, costs, or charges provided for
> under the agreement under which such claim arose.

11 U.S.C. § 506(b).  Interest becomes a part of the creditor's oversecured claim under section

506(b).  *Rake v. Wade*, 508 U.S. 464, 471 (1993).

Section 506(a) establishes the extent to which a claim is a secured claim.  "An allowed

claim of a creditor secured by a lien on property in which the estate has an interest . . . is a

secured claim to the extent of the value of such creditor's interest in such property. . . ."

11 U.S.C. § 506(a).

Although the Debtors concede that they did grant Gabriel liens and security interests in

all of their assets except the FCC Licenses themselves (but not their proceeds), and although the

Debtors undeniably have netted nearly $50 million in cash from the sales of their Licenses after

paying the FCC in full, the Debtors claim that Gabriel does not have a valid security interest in

any property or, if it does, the security interest must be deemed worthless.  Both arguments are

meritless for the reasons set forth below.

**B.    Gabriel Had, and Has, a Perfected Security Interest.**

The initial question that must be addressed is whether Gabriel had a perfected security

interest.  The Debtors have not challenged the validity of the underlying prepetition transaction

nor disputed that they granted Gabriel security interests in all of their assets other than the

Licenses (but including their proceeds).  Rather, they argue that either (i) as a result of the FCC's

9

failed attempt to cancel the Licenses during the chapter 11 proceedings, or (ii) because Gabriel

(arguably) does not have direct liens in the Licenses themselves, Gabriel has *no* security

interests. The Bankruptcy Court properly held that this argument is specious.

First, the law is well established that, irrespective of Debtors' (presumed) inability to

grant Gabriel liens in the Licenses themselves, Gabriel nonetheless has always had valid liens in

any and all proceeds from the licenses. In *MLQ Investors, L.P. v. Pacific Quadrasting, Inc.*, 146

F.3d 746 (9th Cir. 1998), the owner of corporate radio stations which held FCC licenses appealed

an order directing that the proceeds from the sale of the corporations' licenses should be

distributed to a creditor who had a security interest in proceeds from the corporation's licenses.

In enforcing the lien on the proceeds, the Ninth Circuit Court of Appeals explained:

> [The owner] argues that a debtor cannot create a voluntary security
> interest in an FCC broadcasting license because doing so would be
> inconsistent with the federal laws that limit the transfer of such
> licenses. However, this argument is directly contrary to the
> holding of *In re Ridgely Communications, Inc.*, 139 B.R. 374, 379
> (Bankr. D. Md. 1992) which held that a creditor may perfect a
> security interest in a debtor's FCC broadcasting license to the
> extent that the creditor seeks to protect its interest in the *proceeds*
> of the debtors' licenses. [ . . .]
>
> In other words, the FCC may prohibit security interests in licenses
> themselves because the creation of such an interest could result in
> foreclosure and transfer of the license without FCC approval.
> Such approval is necessary to regulate the airwaves in the public
> interest. No such public interest is implicated, however, by a
> security interest in the proceeds of a license, which does not grant
> the creditor any power or control over the license or the segment of
> the broadcast spectrum it represents. The FCC itself has explicitly
> adopted this reasoning. *See In re Cheskey*, 9 FCC RCS 986, 987
> (1994) (holding that a licensee may give security interest in the
> proceeds of sale of license, but not the license itself).

*MLQ Investors,* 146 F.3d at 748 (emphasis in original).

Furthermore, the Ninth Circuit explicitly ruled, as commercial necessity requires, that the

creditor's security interest in the debtors' rights to receive the proceeds of a license sale was

perfected when <u>granted</u>, not upon the debtor's receipt of cash proceeds from a subsequent sale:

> Since the licensee has rights and interests in the license proceeds
> which include a limited right to pledge those proceeds as collateral,
> we see no reason why the proceeds should not be considered
> "general intangibles," therefore subject to perfection prior to sale.
> . . .
>
> A security interest in proceeds that could not be perfected until
> after foreclosure and sale of the license would, in almost every
> circumstance by primed by liens and claims of . . . other creditors
> [rendering *In re Ridgley* and *In re Cheskey* meaningless]. **The fact
> that in the present case the actual dollar proceeds from the sale
> of the licenses were generated only after the sale . . . is
> immaterial.**
>
>           \*     \*     \*
>
> A creditor may obtain a security interest in the proceeds of the sale
> of an FCC license, and such an interest constitutes a "general
> intangible" that may be perfected prior to sale of the license.

*Id.* at 749. (emphasis added).

Accordingly, Gabriel's liens on the License sale proceeds have been in existence

continuously since 1996 and throughout the course of the Cases.  The Bankruptcy Court was

correct in rejecting the Debtors' argument that Gabriel had no security interest, if at all, until the

Licenses were sold

In addition, all of UC-NC's arguments that Gabriel's claim is unsecured are essentially

moot because Gabriel also has undisputed liens in all or substantially all of the Debtors' *other*

assets, including general intangibles and the capital stock of UC-NC (which holds the cash) and

UC-MA.  For example, if, *arguendo*, Gabriel did not have a lien on any property of UC-NC and

was not entitled to receive interest from UC-NC under Section 506(b), UC-NC would be solvent

(it has virtually no debt other than its debt to Gabriel), and UC-NC's stock would be worth tens

of millions of dollars. UC-NC's stock is owned by UC-MA. Gabriel also has a claim against UC-MA, and that claim is secured by UC-NC's stock. Therefore, based on these undisputed facts, Gabriel would still be an oversecured creditor of UC-MA, irrespective of what interest it has in the Licenses or the License sale proceeds. Gabriel would still be entitled to post-petition interest under Section 506(b) even if it had no collateral whatsoever at the UC-NC level. The Debtors' arguments about whether Gabriel's liens attach to the proceeds of the FCC Licenses are thus without economic or legal consequence.

The Bankruptcy Court clearly understood this but the Debtors seemingly did not. In the Appellants' Brief, they argue that "the Debtor's estate that must be examined for purposes of Gabriel's claim to post-petition interest is solely the UC-NC estate; the holder of the Licenses" and ascribe error to the Bankruptcy Court's consideration of UC-MA and UC-LP's property. Appellants Brief at 18-19. Far from having improperly treated the Debtors on a consolidated basis, the Bankruptcy Court understood that Gabriel has *independent* oversecured claims against *each* Debtor, because the cash sale proceeds must be dividended upwards through the chain of solvent Debtors before it can reach UC-MA and its equity holders. Therefore, even if Gabriel had no claim at all against UC-NC, which held the Licenses, it would still be an oversecured creditor entitled to interest. Although the Debtors may do back flips to try to argue Gabriel does not have a claim in the FCC License sale proceeds held by UC-NC, the argument ultimately makes no difference in the amounts of Gabriel's allowed claim. Gabriel is still an oversecured creditor of UC-MA and UC-LP, where the Debtors' inventive FCC/License arguments have not application.

Furthermore, Gabriel's liens in the Debtors' general intangibles encompass not just the sale proceeds, but also any claims and causes of action possessed by the Debtors. See UCC § 9-

102(42). During the periods of time that the licenses were supposedly cancelled, Gabriel had a lien upon UC-NC's rights to recover damages from the FCC for wrongfully canceling the licenses and/or obtain reinstatement of the Licenses -- those rights have been vindicated. The Debtors baldly deny such rights had any value, but UC-NC's ultimate retention and profitable liquidation of the Licenses demonstrate that the rights became worth over $140 million.

The Ninth Circuit's decision in *Thacker v. FCC (In re Magnacom Wireless, LLC)*, 503 F.3d 984 (9th Cir. 2007) does not change this analysis at all. *Magnacom* was an adversary proceeding brought by a <u>debtor</u> seeking to recover money from the FCC. It had nothing to do with the allowance of a secured claim. In *Magnacom*, the FCC had *lawfully* cancelled the Debtors' licenses, by first obtaining relief from the automatic stay from the Bankruptcy Court, which stated in its order that "the FCC may pursue immediately any and all of its remedies, including its right to cancel the Defaulted Licenses. . . ." *Id.* at 989. In addition, Magnacom's chapter 7 trustee, unlike the Debtors here and the debtor in *NextWave*, did not challenge the FCC's cancellation of the licenses, did not seek relief based on 11 U.S.C. § 525, and did not seek to recover its licenses or set aside the transfer of new licenses. *Id.* at 991. The FCC later auctioned off new licenses for spectrum, and only then did Magnacom demand a share of the proceeds from the FCC. The Ninth Circuit found that because Magnacom's licenses were *lawfully* cancelled, the FCC's later sales of rights to use airwaves generated no traceable proceeds for Magnacom. *Id.* at 995.

*Magnacom*, obviously, is thoroughly inapposite to the Debtors' Appeal. Here, the FCC wrongfully attempted to take UC-NC's FCC Licenses without obtaining stay relief, the Debtors successfully fought to retain their Licenses, the Debtors (not the FCC) re-sold those same FCC Licenses to third parties at a profit, the Debtors received the proceeds, and the Debtors are

13

seeking to retain the proceeds to benefit insider equity-holders rather than pay interest to their senior secured creditor. *Magnacom* provides no support for the Debtors' implausible argument that the FCC's <u>failed</u> efforts to cancel UC-NC's Licenses somehow resulted in UC-NC having $140 million of licenses, yet wiped out all of Gabriel's security interests in all of the Debtors' assets. In fact, it is rather surprising that the Debtors would rely on *Magnacom* at all because, if its holdings were applicable to the facts here, neither Gabriel <u>nor</u> the Debtors would be able to realize any value from the sale of the Licenses.

One would have to bury their head in the sand to accept the Debtors' argument that all of Gabriel's collateral interests were destroyed or rendered worthless by the FCC's invalid and failed attempts to cancel the Licenses, yet the Debtors somehow netted $50 million of unencumbered cash after repaying the FCC in full. The Bankruptcy Court's ruling that Gabriel is a secured creditor was not erroneous, and in fact is the only possible ruling.

**C.**     **The Collateral Must Be Valued at the Time of Its Disposition.**

The remaining question for adjudication, thus, is whether, for purposes of Section 506(b), collateral should be valued as of the petition date or the time of its disposition (or some other time). The overwhelming majority of authorities hold that collateral must be valued at the time of its disposition for purposes of section 506(b). Moreover, under the facts here, valuing the collateral at the time of sale is required, because freezing the value on the petition date would result in the subsequent increase in the asset values accruing to the Debtors, not Gabriel, in contravention of the Supreme Court's ruling in *Dewsnup*.

The Bankruptcy Court properly followed authority holding that collateral should be valued at the time of its disposition (with the Debtors' having failed notably to cite any contrary authority). The reasons for this rule include that a good faith, arm's-length transaction is the

most fair, reliable and easily applied measure of value. *See, e.g., Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 870 (4th Cir. 1994) ("We hold that when secured collateral has been sold, so long as the sale price is fair and is the result of an arm's-length transaction, courts should use the sale price, not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest under § 506(b)"); *see also, id.* at 871 ("Of course, secured creditors may benefit by a § 506(b) valuation based on sale price if the collateral appreciates postpetition and the property is sold for more than it was appraised earlier in the proceedings."); *Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931 (Bankr. 9th Cir. B.A.P. 1993) ("If an actual disposition is to occur, regardless of the purpose of the valuation, the value of the collateral should be based on the consideration to be received by the estate in connection with the disposition, provided that the court determines such consideration is fair and was arrived at on an arm's-length basis."); *In re Two "S" Corp.*, 875 F.2d 240, 243 (9th Cir. 1989) (evidence of appraised values irrelevant because sale price is better indicated or value); *In re Mitchell*, 81 B.R. 171, 173 (Bankr. D.D.C. 1988) (utilizing sales price); *In re National Computer Comm. Corp.*, 85 B.R. 6 (Bankr. D. Conn. 1988) ("the *Timbers* Court read § 506(b) to limit postpetition interest to only those creditors determined to be oversecured at the *completion* of the reorganization, *i.e.*, the effective date of a confirmed plan.") (emphasis in original); *In re Stoller's Inc.*, 93 B.R. 628 (Bankr. N.D. Ind. 1988) (if collateral is sold during the pendency of the case, the determinative date for measuring entitlements to the proceeds of the disposition should be the time of disposition); 4 COLLIER ON BANKRUPTCY, 506.03[6][b] at p. 506-43 (15th Ed. Rev.) (if an actual sale . . . is to occur, the value of the collateral should be based on the consideration to be received by the estate in connection with the sale provided that the terms of the sale are fair and were arrived at on an arm's-length basis).

15

Moreover, the leading authorities have held that where a creditor is oversecured as of the date of the disposition of its collateral, the creditor is entitled to post-petition interest up to the amount of its equity cushion in the collateral *even if the collateral had been worth less than the creditor's claim as of the petition date or some other earlier date.* See *In re Ford Motor Credit Co.*, 35 F.3d 860, 870 (4th Cir. 1994) (where secured collateral has been sold, "courts should use the sale price, not some earlier hypothetical valuation to determine whether a creditor is oversecured and thus entitled to postpetition interest under § 506(b)" to "best effectuate the policy behind § 506(b)," and observing "[o]f course secured creditors may benefit by a § 506(b) valuation based on sale price if the collateral appreciated postpetition and the property is sold for more than it was appraised earlier in the proceeding."). *See further In re Alpine Group, Inc.*, 151 B.R. 931 (9th Cir. B.A.P. 1993) (holding that where creditor was undersecured at commencement of case but collateral was subsequently sold for more than the amount of creditor's lien as a result of post-petition improvements the debtor made to the property, the sale price less the actual cost of the improvement would be used to determine the creditor's entitlement to postpetition interest because "it would clearly be inequitable for the entire benefit of the increase in value to inure to the debtor").

Under the facts here, there is an even more compelling reason to use the sale prices to value the collateral: the Supreme Court's ruling in *Dewsnup.* In *Dewsnup*, the Supreme Court granted *certiorari* to resolve a split between the Courts of Appeals for the Third Circuit and the Tenth Circuit regarding the interaction of Section 502(a) and Section 502(d). The debtors in *Dewsnup* had sought to reduce or "strip" a creditors' lien down to the amount of the judicially determined value of the creditors' collateral. The Supreme Court rejected the argument because:

> [t]he practical effect of petitioner's argument is to freeze the
> creditor's secured interest at the judicially determined valuation.

> By this approach, the creditor would lose the benefit of any
> increase in the value of the property by the time of the foreclosure
> sale. The increase would accrue to the benefit of the debtor, a
> result some of the parties describe as a "windfall."
>
> We think, however, that the creditor's lien stays with the real
> property until the foreclosure. That is what was bargained for by
> the mortgagor and the mortgagee. . . .**Any increase over the
> judicially determined valuation during bankruptcy rightly
> accrues to the benefit of the creditor, not to the benefit of the
> debtor and not to the benefit of other unsecured creditors
> whose claims have been allowed and who had nothing to do
> with the mortgagor-mortgagee bargain.**

Id. at 417 (emphasis added).

Gabriel, not the Debtors, is entitled to the benefit of the increase in its collateral during the ten years it has been waiting to be repaid. The Debtors are attempting to accomplish, without any relevant legal authority, precisely what *Dewsnup* proscribes: using a speculative pre-sale valuation to fix the secured portion of Gabriel's claim in order that the subsequent increase in the value of its collateral will accrue to the benefit of the Debtors and their equity holders,[5] rather than Gabriel. The Bankruptcy Court properly rejected the Debtors' unsupported arguments. There is no basis for reversing the Bankruptcy Court's holding that Gabriel's claims are over-secured and Gabriel is entitled to receive post-petition interest pursuant to 11 U.S.C. 506(b).

---

[5] Gabriel has not appealed from that portion of the Bankruptcy Court Order holding that the Court has discretion to reduce the rate of interest allowable to Gabriel to the extent necessary to permit repayment of UC-NC's creditors in full and render UC-NC solvent. Therefore, the issue before the Court in practicality is not even a secured creditor vs. unsecured creditor issue, but a secured creditor vs. insider shareholder issue.

## CONCLUSION

For the foregoing reasons, Gabriel requests the Court to affirm the Bankruptcy Court

Order with respect to the issues raised on appeal by the Debtors.


Dated:    March 13, 2008
          New York, New York


                              KASOWITZ, BENSON, TORRES
                                & FRIEDMAN LLP

                               /s/ Robert M. Novick
                              David M. Friedman (DF 4278)
                              Robert M. Novick (RN 4037)
                              1633 Broadway
                              New York, New York  10019
                              Tel:  (212) 506-1700
                              Fax:  (212) 506-1800

                              COUNSEL TO GABRIEL CAPITAL L.P.