**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (CES-2130)

Attorneys for Appellants, Urban Communicators PCS
 Limited Partnership, *et al.*, Debtors-in-Possession

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
URBAN COMMUNICATORS PCS LIMITED  : 08 Civ. 502
PARTNERSHIP, *et al.*,            : 08 Civ. 945
                                  : 08 Civ. 946
                Appellants.  : 08 Civ. 947 (RWS)
                                  :
     -against-                   : USBC  98-B-47996
                                  :       98-B-47997 and
GABRIEL CAPITAL, L.P.,            :       98-B-10086 (REG)
                                  :
                Cross-Appellant. : <u>Jointly Administered</u>
                                  :
-------------------------------------------------------------x

## APPELLANTS' REPLY BRIEF

**WINDELS MARX LANE & MITTENDORF, LLP**
Charles E. Simpson (CES-2130)
156 West 56th Street
New York, New York 10019
(212) 237-1000

Attorneys for Appellants, Urban Communicators PCS Limited
Partnership, *et al.*, Debtors-in-Possession

{10448027:1}

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Dewsnup v. Timm*, 502 U.S. 410, ..................................................................................3

*In re Eastview Estates II*, 713 F.2d 443 ..........................................................................8

*In re Ernst*, 2008 U.S.Dist. LEXIS 11028 ......................................................................9

*In re Jonick Deli Corp.*, 263 B.R. 196 ............................................................................2

*In re Ovetsky*, 100 B.R. 115 ............................................................................................8

*In re Reilly*, 245 B.R. 768 ...............................................................................................2

*In re Taylor*, 263 B.R. 139 .............................................................................................7

*Taylor citing Bessette v. Avco Financial Services, Inc.*, 240 B.R. 147 .........................7

*Thacker v. FCC*, 2007 U.S.App. LEXIS 22151 .............................................................3

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 127
   S.Ct. 1199 .....................................................................................................................8

## FEDERAL STATUTES

11 U.S.C. § 502(b) ............................................................................................................8

FCC's Rules and Regulations, 47 C.F.R. § 1.2110(g)(4) ................................................6

47 C.F.R. 1.2110(g)(4) .....................................................................................................6

Fed. R. Bankr. P. 8010(a)(1)(B) ......................................................................................2

Fed. R. Bankr. P. 8013 .....................................................................................................4

## OTHER

4 Collier ¶ 502.03[2][b] ...................................................................................................8

4 Collier ¶ 502.03[2][b][ii] ..............................................................................................8

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (CES-2130)

Attorneys for Appellants, Urban Communicators PCS
  Limited Partnership, *et al.*, Debtors-in-Possession

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | | |
|---|---|---|
| URBAN COMMUNICATORS PCS LIMITED PARTNERSHIP, *et al.*, | : : : | 08 Civ. 502<br>08 Civ. 945<br>08 Civ. 946 |
| Appellants. | : : | 08 Civ. 947 (RWS) |
| -against- | : : | USBC 98-B-47996<br>    98-B-47997 and |
| GABRIEL CAPITAL, L.P., | : : | 98-B-10086 (REG) |
| Cross-Appellant. | : : | <u>Jointly Administered</u> |

-----------------------------------------------------------------x

Appellant, Urban Comm-North Carolina, Inc. ("UC-NC"), Urban Communicators PCS Limited Partnership ("UC-LP") and Urban Comm-Mid-Atlantic, Inc. ("UC-MA"), Debtors-in-Possession (jointly referred to herein as the "Appellants" or "Debtors"), by their undersigned counsel, as and for their Reply Brief in furtherance of Appellants' appeal from the "Decision and Order on Gabriel Entitlement to Post-Petition Interest" of Honorable Robert E. Gerber, United States Bankruptcy Judge, So-Ordered December 11, 2007 ("Bankruptcy Court Order"), granting Gabriel Capital, L.P.'s ("Gabriel") motion for an award of pendency interest, respectfully represent as follows:

{10448027:1}                                3

## I. STATEMENT OF ISSUE PRESENTED ON APPEAL

Whether Gabriel Capital, L.P. is an oversecured creditor pursuant to section 506(b) of the Bankruptcy Code.

## II. APPELLANT'S STATEMENT OF STANDARD OF APPELLATE REVIEW[1]

A district court reviews a bankruptcy court's conclusions of law de novo. *In re Jonick Deli Corp.*, 263 B.R. 196, 198 (S.D.N.Y. 2001); The same standard of review applies to a bankruptcy court's conclusions on mixed questions of fact and law. *In re Reilly*, 245 B.R. 768, 772073 (B.A.P. 2d Cir. 2000). Findings of fact made by a bankruptcy court may be set aside where clearly erroneous. See Fed. R. Bankr.P. 8013.

## III. INTRODUCTION

The instant appeal seeks a determination of the question of whether a creditor may be considered oversecured under section 506(b) and, therefore, entitled to post-petition interest, when the collateral securing its claim and to which the security interest allegedly attaches, ceases to exist by operation of law during the pendency of the bankruptcy case. Tangential to the foregoing question is whether, for purposes of determining the secured status of a creditor under section 506(b), collateral securing a claim is valued as of the petition date or upon the liquidation of said collateral. Despite the Bankruptcy Court's determination that valuation of the collateral in the instant case should be determined upon liquidation of the collateral, thus rendering Gabriel an oversecured creditor under section 506(b) and entitled to post-petition interest on its claim, the Debtors maintain that section 506(b), read in conjunction with section 502(b)(1), along with

---

[1] Gabriel contends that Appellants' opening brief is deficient in that it did not include a statement of the basis of appellate jurisdiction and a statement of the applicable standard of appellate review pursuant to Fed. R. Bankr. P. 8010(a)(1)(B),(C). The Court should note that the filing of Gabriel's opening brief, which did include the basis of appellate jurisdiction and a statement of the applicable standard of appellate review, preceded the filing of the Debtors' opening brief. As the basis of appellate jurisdiction and applicable standard of appellate review and the order appealed from, as outlined in Gabriel's brief, is the same for both parties, the Debtors' alleged deficiency is immaterial.

the recent holding in *Thacker v. FCC*, 2007 U.S. App. Lexis 22151 (hereinafter referred to as "*MagnaCom*"), renders Gabriel an undersecured creditor at best, and, at worst, the holder of an unenforceable claim.

      Gabriel contends that the sole issue to be considered in this appeal is whether an increase in the value of collateral securing a loan during bankruptcy proceedings accrues to the benefit of the secured creditor or to the benefit of the debtor and its equity holders. Gabriel, relying on the Supreme Court's holding in *Dewsnup v. Timm*, 502 U.S. 410, (1992), argues that the proceeds realized from the sale of the Licenses qualifies Gabriel as an oversecured creditor under section 506(b) entitling it to the contract rate of interest on its claim, a rate that has been determined to be violative of New York's criminal usury statute. The Debtors, however, posit that *Dewsnup* is inapposite to the circumstances in the instant case. Here, Gabriel's interest in proceeds from the sale of the Licenses was subordinated to the FCC's interest in proceeds from sale of the Licenses. Cancellation of the Licenses effectively cut off UC-NC's right to utilize the underlying spectrum for any purpose whatsoever, be it build-out or sale. Without the Licenses granting access to the underlying spectrum, the Debtors had nothing to sell to realize proceeds from. Consequently, from the point that the Licenses were cancelled until the time that they were restored, Gabriel's interest in the proceeds from the sale of the Licenses was equal to the Debtors interest in the proceeds from the sale of the Licenses – zero. Unlike the collateral in *Dewsnup*, farmland, the Licenses were intangible assets that were cancelled by operation of law, usurping the Debtors of any interest in proceeds derived from the liquidation thereof for a significant period of time. There simply was not anything for interest to accrue upon during the period subsequent to cancellation and prior to the Licenses being restored. In light of the foregoing, the Debtors contend that (i) Gabriel is an undersecured creditor under section 506(b), (ii) the value

of Gabriel's collateral must be determined as of the date of the filing of the petition pursuant to section 502(b)(1), and (iii) at the very least, 40% of Gabriel's claim, if not the entire claim, is unenforceable pursuant to section 502(b)(1).

## IV. GABRIEL'S COUNTER-STATEMENT OF THE CASE

As a general matter, the Debtors do not dispute Gabriel's counter-statement of the case contained in its Opposition Brief, to the extent it is relevant to the issues on appeal, except as noted herein.

In its opposition brief, Gabriel correctly states that the Debtors and Gabriel entered into a series of related agreements on or as of August 12, 1996 pursuant to which Gabriel loaned the principal amount of $8,000,000 to UC-NC. Gabriel mischaracterizes, however, the Amendatory Agreement, which increased the aggregate principal amount of UC-NC's debt to Gabriel to $9 million. What Gabriel fails to disclose is that they did not actually purchase an additional $1 million note. The note given to Gabriel under the Amendatory Agreement was merely to delay Gabriel's foreclosure on its loan and give the Debtors additional time to identify a source of financing. No consideration was given for the $1 million note and Gabriel never advanced that amount to Gabriel. The $1 million dollar note was, in effect, a penalty upon which Gabriel charged 15% interest. Upon the Debtors default under the Amendatory Agreement, the interest rate sought by Gabriel on that penalty increased to 19% compounded quarterly.

In its counter-statement of the case, Gabriel cites that portion of the Appellant's Brief that posits that the FCC Licenses were worth approximately $9.5 million on the Petition Date, noting that the Bankruptcy Court received no evidence as to the value of the Licenses as of any particular date... (*See* Gabriel Opposition Brief at 5.) The fact of the matter, however, is that

there has never been an evidentiary hearing on valuation of the Licenses and Gabriel has at no point disputed that valuation or the basis for it.[2]

Gabriel further states in its counter-statement that "the FCC *asserted* that the Debtors' Licenses were cancelled, however, they did not *succeed* in that assertion." (Emphasis in original. *See* Gabriel Opposition at 6.) It must be clarified that the Licenses were cancelled. Subsequent to the cancellation of the Licenses pursuant to 47 CFR 1.2110(g)(4)(iv), UC-NC was left with no proprietary rights in the Licenses after its default on its obligation to the FCC. Cancellation effectively extinguished UC-NC's rights in the Licenses as the underlying spectrum was transferred to new licenses that were sold. The Debtor attempted to get stays from both the D.C. Circuit and the Second Circuit in an effort to forestall the re-auction of the Licenses by the FCC, however, both attempts were denied. Despite how Gabriel attempts to characterize the FCC's action with respect to the Licenses, they did not merely assert that the Licenses were cancelled, they cancelled them. Accordingly, the Debtors could not have, in defiance of the FCC's *assertion,* exercised any rights with respect to the Licenses whatsoever.

Gabriel mentions in its counter-statement that the Debtors have repaid their Chairman's loans to the Debtors with 15% interest. What they fail to mention, however, is that Gabriel consented to the loans, approved their repayment and the fact that prior to the sale of its Licenses, the Debtors had virtually no income from operations, but were forced to finance the cost of regaining its Licenses from the FCC and the expenses of bankruptcy administration. The fact that Gabriel would take issue with the Chairman financing the Debtors throughout this process when they have benefited immensely as a result of the Chairman's actions is baffling. To date, Gabriel has realized over a 300% return on its original loan to the Debtors and continue

---

[2] The basis for the Debtor's valuation of the Licenses on the petition date is the value received for similar licenses during the period immediately following the petition date and the values attributed to similar licenses by Bankruptcy Courts in this district and other jurisdictions.

to petition for more. Nevertheless, Gabriel takes umbrage with the Chairman floating money to prop up Debtors that had not received any income for nearly 7 years.

III.

## ARGUMENT

**Gabriel is an undersecured**
**creditor pursuant to section 506(b)**

It has always been the Debtors' position that Gabriel was undersecured from the petition date up until the time that proceeds from the sale of the licenses in excess of the FCC's claim were realized. In response to the Debtors' contention that on the petition date, and as a result of the FCC's cancellation of its licenses under the FCC's Rules and Regulations, 47 C.F.R. § 1.2110(g)(4)(iv), the Licenses could not have garnered enough proceeds to cover the first lien of the FCC, let alone Gabriel's second lien, the Bankruptcy Court noted that Gabriel's collateral did not consist solely of its interest in proceeds derived from the sale of the Licenses, but consisted of a bundle of available assets, including its litigation rights against the FCC and the equity securities which were pledged by each Debtor as guarantors in favor of Gabriel. The Court inexplicably equated the value of the prospective proceeds to be derived from sale of the Licenses with the value of the litigation rights and common stock of the Debtors whose stock was pledged.

With respect to the litigation rights, these rights are valuable only to the extent that they are exercised. Gabriel, however, chose not to exercise these rights against the FCC when they had every opportunity to do so, instead writing off the loan and leaving the Debtors to fend for themselves against the FCC. The value of these rights were further diminished by the fact that under section 525, there exists no private right of action for damages against the FCC for the cancellation of the licenses. In a case directly addressing the dual issue of whether a private right

of action exists under § 525(c)(1) for money damages and determining the scope of section 105(a) in the context of creating a private right of action and awarding damages, the court in *In re Taylor*, 263 B.R. 139 (N.D.Ala. 2001) determined that "no private right of action exists under section 525(c)(1) for money damages [as the plain language of the section] does not provide clear evidence of Congress' intent to create a private right of action to impose damages pursuant to § 525(c)(1)." The *Taylor* Court also determined that § 105(a) cannot be used to create substantive rights that are not explicitly created in Title 11. *Taylor* citing *Bessette v. Avco Financial Services, Inc.*, 240 B.R. 147, 156 (D.R.I. 1999) (Bessette overruled on unrelated issues). Gabriel now seeks to be the sole beneficiary of the Debtors' exhaustive efforts to regain its Licenses, with absolutely no benefit inuring to the Debtors whatsoever.

In its opposition brief, Gabriel emphasizes the fact that it has liens on substantially all of the Debtors' other assets, separate and apart from any lien it has on property of UC-NC, and are thereby oversecured. Gabriel further contends that they would still be entitled to post-petition interest under section 506(b) even if it had no collateral whatsoever at the UC-NC level. This, however, flies in the face of reason considering the fact that UC-LP and UC-MA have always been insolvent and without the existence of the Licenses, the Debtors are virtually valueless. Gabriel has been paid upwards of $23 million to date and has realized a nearly 300% return on its initial loan. The fact that they have security on other estate assets is irrelevant as once Gabriel's claim was paid by UC-NC, Gabriel's claim was satisfied and these other assets, which had always been of little value, no longer guaranteed payment of Gabriel's claim.

**The value of Gabriel's collateral must be determined as of the date of the filing of the petition pursuant to section 502(b)(1).**

Section 502(b)(1) states, in pertinent part:

> § 502. Allowance of claims or interests.
>
> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, <u>if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition</u>, and shall allow such claim in such amount, <u>except to the extent that-</u>
>
> > (1) <u>such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law</u> for a reason other than because such claim is contingent or unmatured.
> > 11 U.S.C. § 502(b)(1). (Emphasis added.)

The effect of section 502(b)(1) is (A) a direction to determine a disputed claim "as of the date of the filing of the petition" and (B) to render unenforceable against the debtor or against the property of the debtor any claim that would be disallowed under applicable nonbankruptcy law. 4 Collier ¶ 502.03[2][b] at p. 502-22 (15th Ed. Rev.). The validity and legality of claims generally is determined by applicable nonbankruptcy law. *In re Eastview Estates II*, 713 F.2d 443 (9th Cir. 1983); *In re Ovetsky*, 100 B.R. 115 (Bankr. N.D. Ga. 1989). The general presumption is that claims enforceable under applicable state law will be allowed unless they are expressly disallowed. *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 127 S. Ct. 1199, 1205 (2007). One defense under state law that is certainly available to a debtor is usury. This defense, being one of state law, must be applied in strict accordance with such law. 4 Collier ¶ 502.03[2][b][ii] at p. 502-24 (15th Ed. Rev.). As noted in the Debtor's Opposition Brief, the Bankruptcy Court calculated that 40% of Gabriel's loan to UC-NC fell within the

purview of New York's criminal usury statute. Instead of voiding the entire loan amount or that portion determined to be usurious, the Court reduced the interest rate to a rate equal to 25% simple interest, the highest permissible amount under New York State law. While the Bankruptcy Court inarguably has the authority to exercise its equitable discretion in reducing the amount of interest Gabriel may receive on its claim, the United States Supreme Court recently reiterated that claims under section 502(b)(1) are governed by state law, under which property interests are defined and created. *Id.* While section 502 requires that the amount of a claim be determined as of the date of the filing of the petition, there is nothing in that section that requires a court to ignore that the claim is no longer valid under state law. *In re Ernst*, 2008 U.S. Dist. Lexis 11028. In accordance with the Ernst decision and the plain language of section 502(b)(1), while not an abuse of its discretion, it was certainly anomalous for the Bankruptcy Court to allow the usurious portion of Gabriel's claim when, under New York State law, the claim is plainly not enforceable and a New York State court would find the claim to be unconscionable. *Id.* The Debtors contend that the portion of Gabriel's loan determined to be usurious by the Bankruptcy Court is disallowable under 502(b)(1).[3]

Gabriel argues in its Opposition Brief that "the Debtors did not argue usury before the Bankruptcy Court at any time during the nine years these Cases have been pending." Gabriel Opposition Brief at 3. The Debtors have, however, argued extensively against the usurious interest rate that Gabriel's quarterly compounding default rate would be the equivalent of. In the Debtors' Opposition to Renewed Motion of Gabriel Capital L.P. for Allowance of Post-Petition Interest on its Claim dated May 7, 2007, incorporated herein via Appellants' Designation of

---

[3] Section 502(b)(1) instructs the Court to determine the amount of each claim as of the date of the filing of the petition, a position that the Debtor has articulated since the beginning of these proceedings. Read in conjunction with section 506(b), as of the date of the filing of the petition, the value of the Licenses were far below the value of the FCC's first claim against prospective proceeds to be derived from the sale of the Licenses, thus rendering Gabriel severely undersecured and not entitled to interest on its claim.

Record on Appeal, the Debtors argued that the default rate put forth by Gabriel of 19%, compounding quarterly results in an effective interest rate of nearly 40%, which is nearly triple the interest rate charged pre-default. The Debtors further argued that this is a rate falling squarely within the bankruptcy cases where the courts refused to enforce disproportionate and unreasonable default interest rates and a rate that qualifies as an unenforceable penalty. Notwithstanding the Debtors' arguments against the usurious interest rate charged by Gabriel, the Bankruptcy Court Order from which both parties appeal spoke at length about that portion of Gabriel's loan that it deemed usurious. As the Bankruptcy Court Order is the sole point of reference to which these appeals relate, the Debtor is not precluded from reiterating language from the Bankruptcy Court Order.

Dated: New York, New York
   March 28, 2008

WINDELS MARX LANE & MITTENDORF, LLP

By: _____
   Charles E. Simpson (CES-2130)
   A Member of the Firm

156 West 56th Street
New York, New York 10019
(212) 237-1000

Attorneys for Urban Communicators PCS Limited
Partnership, et al., Debtors-in-Possession

{10448027:1}                                    12